PATRICIA RIVET MURRAY, Judge.
 

 | ,This is a survival action under La. C.C. art. 2315.1. This action arises out of a pedestrian-automobile accident. The trial court’s finding of comparative fault — fifty percent to both the pedestrian and the driver — is not disputed. The principal issues on appeal are causation and damages.
 

 FACTUAL AND PROCEDURAL BACKGROUND
 

 On November 19, 2008, Flora Williams, an eighty-eight year old pedestrian, was attempting to walk across South Broad Street in New Orleans when she was struck by the vehicle driven by James Stewart, an on-duty deputy with the Orleans Parish Criminal Sheriffs Department (the “Department”). Following the impact, Mrs. Williams fell to the ground striking the back of her head on the pavement.
 

 At the time of the accident, Deputy Stewart was making a left turn off of Palmyra Street onto South Broad Street, southbound toward Tulane Avenue. According to Deputy Stewart, he never saw Mrs. Williams until after the accident. When he began to accelerate to make the left turn, he spotted a black object right on his windshield.
 
 [1]
 
 He immediately stopped his car and opened the door. When | ahe did so, he found Mrs. Williams lying on the street in a prone position with her feet facing his left front tire. She was dressed in a black sweater and had a walking cane,
 
 [2]
 
 and he noticed that her lip was lacerated. He noted no other injuries. Mrs. Williams informed him that she wanted to go home, and attempted to leave. Deputy Stewart stated that he had to “walk fast after her to grab her and hold her” because he could not let her leave without getting medical treatment.
 

 Captain Carlos Louque, the Special Investigations Division officer who investigated the accident for the Department, similarly stated that Mrs. Williams was walking around, that she kept insisting that she wanted to go home, and that the officers had to convince her to sit down in order to obtain medical treatment. The only injury to Mrs. Williams that Captain Louque recalled was a bleeding, lacerated lip. He described her mental status as disoriented. He explained that “[s]he really couldn’t tell us what her name was or anything.” Likewise, Officer Jason Lewis, the New Orleans Police Department officer who investigated the accident, indicated that he was unable to get any statement from Mrs. Williams because she was incoherent.
 

 From the scene of the accident, Mrs. Williams was taken by ambulance to the Medical Center of Louisiana at New Orleans, LSU Health Science Center
 
 *270
 
 (“LSUMC”), where she was admitted. At LSUMC, her lacerated lip was sutured, and a CAT scan was performed. This scan revealed bleeding near the left back portion of the brain. Mrs. Williams spent one week in the intensive care unit ls(“ICU”). During her hospital stay at LSUMC, she required physical therapy, occupational therapy, and speech therapy.
 

 About a day and a half after the accident, Mrs. Williams’ son, Lucky Williams — who was in Mobile (Chickasaw), Alabama where he lived — received a phone call from his mother’s neighbor informing him that his mother had been hit by a car and was in LSUMC. Mr. Williams came to New Orleans the next morning to see his mother. According to him, in fifty years he had never seen his mother in a hospital bed until he walked into the ICU unit the day after the accident. The LSUMC doctors told him that his mother had “received a blow to the back of her head, at the base of her head, and said that she had bleeding on her skull or brain in the back — in the back of her head as a result of being struck by the car.”
 

 Following a two-week hospital stay, Mrs. Williams was discharged to the care of her son, who took her to live with him and his wife in Mobile. Mr. Williams and his wife attempted to care for Mrs. Williams in their home. Unfortunately her condition eventually deteriorated. She developed increasing difficulties with agitation, inability to recognize family members, confusion, slurred speech, difficulty sleeping, and insomnia. About three months after the accident, Mrs. Williams was admitted to an Alabama hospital, Mobile Infirmary. At that time, a MRI was taken; this showed that the head bleeding revealed on the CAT scan taken at LSUMC was still present. Ultimately, Mrs. Williams was placed in an Alabama nursing home, Sea Breeze Health Care Center (“Sea Breeze”), where she died on May 13, 2008.
 
 [3]
 

 |4Before Mrs. Williams died, she commenced this tort suit against Deputy Stewart and the Department.
 
 [4]
 
 In her petition, she averred that as a result of the accident she suffered a lacerated lip and cranial bleeding. She further averred that following the accident she developed progressive confusion, dementia, slurred speech, uncontrollable gestures, insomnia, and increased combative behavior and that she continued to suffer from those symptoms. By amending petition, Mrs. Williams added as a defendant the Orleans Parish Criminal Sheriff Marlin N. Gusman, in both his individual and official capacity.
 

 Before trial, Mrs. Williams died. Her children were substituted as proper party plaintiffs. Her children (the “Williams Family”) litigated this case solely as a survival action; they asserted neither loss of consortium nor wrongful death claims.
 

 On August 24, 2009, a one-day bench trial was held. At trial, the Williams Family called three witnesses: Officer Lewis, Captain Louque, and Lucky Williams. The Williams Family also introduced medical records from the three health care providers who cared for Mrs. Williams between the date of the accident and her death — LSUMC, Mobile Infirmary, and Sea Breeze. Defendants called two wit
 
 *271
 
 nesses: Dr. Chad Domangue, who was qualified as an expert in the field of neurology, and Deputy Stewart.
 
 [5]
 

 On November 17, 2009, the trial court rendered judgment in favor of the Williams Family and against three defendants — Deputy Stewart, the Department, and Sheriff Gusman (collectively “Defendants”). The trial court found that the | avehicle Deputy Stewart was driving struck Mrs. Williams. The trial court also found that Mrs. Williams and Deputy Stewart each were fifty percent at fault. The trial court made three findings regarding causation: (i) as a result of this accident Mrs. Williams suffered a closed head injury, which included a left occipital injury, a 3.9
 
 [6]
 
 centimeter contusion and subdural bleeding; (ii) these injuries caused Mrs. Williams to remain hospitalized or institutionalized until her death; and (iii) Mrs. Williams lost her ability to maintain herself and her mobility. Based on these findings, the trial court awarded $450,000.00 in general damages and $45,138.42 in special damages, reduced by fifty percent comparative fault. From this judgment, Defendants appeal.
 

 DISCUSSION
 

 As a preliminary matter, Defendants contend that the trial court improperly cast in judgment the Department, a non-existent legal entity, and Sheriff Gus-man in his individual, as opposed to in his official, capacity. To the extent this court affirms the judgment against Deputy Stewart, Defendants submit that the judgment should be amended to provide that it is additionally rendered against only the “Orleans Parish Criminal Sheriff Marlin N. Gusman in his official capacity.” We agree. As Defendants point out, the Department is not a legal entity capable of being sued; the sheriff in his official capacity is the proper party to be sued.
 
 See Riley v. Evangeline Parish Sheriff’s Office,
 
 94-0202 (La.4/4/94), 637 So.2d 395 (holding that “all parties understood that plaintiffs suit against the ‘Sheriffs Office’ raised claims against the sheriff in his official capacity”);
 
 see also Garner v. Avoyelles Parish Sheriff’s Dep’t,
 
 511 So.2d 8, 9 (La.App. 3rd Cir.1987). The Williams Family acknowledges that the judgment should have been rendered against Sheriff Gusman in his official capacity only.
 
 Riley, supra; Jenkins v. Jefferson Parish Sheriff’s Office,
 
 402 So.2d 669 (La.1981). Accordingly, the judgment will be amended to provide that it is rendered against only Deputy Stewart and Sheriff Gusman in his official capacity.
 

 As noted at the outset, the principal issues on appeal are causation and damages. We separately address each of these issues.
 

 CAUSATION
 

 A plaintiff in a tort ease has the burden of proving by a preponderance of the evidence that the accident more probably than not caused the claimed disabling condition.
 
 Dixon v. Travelers Ins. Co.,
 
 02-1364, pp. 8-9 (La.App. 4 Cir. 4/2/03), 842 So.2d 478, 484 (citing
 
 Jones v. Peyton
 
 
 *272
 

 Place, Inc.,
 
 95-0574, p. 12 (La.App. 4 Cir. 5/22/96), 675 So.2d 754, 763). The test for determining the causal relationship between an accident and a subsequent injury is whether the plaintiff proved through medical and lay testimony that it is more probable than not that the subsequent injuries were caused by the accident.
 
 Maranto v. Goodyear Tire & Rubber Co.,
 
 94-2603, 94-2615, p. 3 (La.2/20/95), 650 So.2d 757, 759;
 
 Jones,
 
 95-0574 at p. 13, 675 So.2d at 763;
 
 Mart v. Hill,
 
 505 So.2d 1120, 1128 (La.1987).
 

 In meeting the burden of proving causation, a plaintiff may be aided by a presumption of causation if before the accident the plaintiff was in good health, but subsequent to the accident the symptoms of the disabling condition appear and those symptoms continuously manifest themselves afterward providing that the evidence establishes a reasonable possibility of causal connection between the accident and the disabling condition.
 
 Dabog v. Deris,
 
 625 So.2d 492, 493-94 (La.1993);
 
 Housley v. Cerise,
 
 579 So.2d 973, 980 (La.1991). This so-called
 
 Housley
 
 presumption can be broken down into three component parts: (i) the plaintiff must prove that he or she was in good health before the accident; (ii) the plaintiff must prove that subsequent to the accident symptoms of the alleged injury appeared and continuously manifested themselves afterwards; and (iii) the plaintiff must prove through evidence — medical, circumstantial, or common knowledge — a reasonable possibility of causation between the accident and the claimed injury.
 
 Juneau v. Strawmyer,
 
 94-0903 (La.App. 4 Cir. 12/15/94), 647 So.2d 1294, 1299. The plaintiff has the burden of proving each component part by a preponderance of the evidence.
 
 Id.
 
 The
 
 Housley
 
 presumption is rebuttable; the defendant may rebut it by showing that some other particular incident could have caused the disabling condition. 19 Frank L. Maraist,
 
 Louisiana Civil Law Treatise: Evidence and Proof,
 
 § 4.3 (citing
 
 Simon v. United States,
 
 51 F.Supp.2d 739 (W.D.La.1999));
 
 Dixon,
 
 02-1364 at pp. 8-9, 842 So.2d at 484;
 
 Maranto, supra.
 

 Another pertinent tort principle is the “egg-shell” plaintiff principle: the well-settled rule that a tortfeasor takes his victim as he finds him and is liable for all the natural and probable consequences of his negligent acts.
 
 Chavers v. Travis,
 
 04-0992, pp. 8-9 (La.App. 4 Cir. 4/20/05), 902 So.2d 389, 394-95 (citing
 
 Lasha v. Olin Corp.,
 
 625 So.2d 1002, 1005 (La.1993)). Under this principle, “[a]n injured person is entitled to recover full compensation for all damages that proximately result from a defendant’s tortious act, even if some or all of the injuries might not have occurred but for the plaintiffs pre-existing physical condition, disease, or susceptibility to injury.” 2
 
 Stein on Personal Injury Damages 3d
 
 § 11.1 (“Stein”). The plaintiff, however, is required to establish a causal link between the tortious conduct and the aggravation of his pre-existing condition.
 
 Chavers, supra.
 
 If the | ^evidence establishes that a plaintiffs pre-accident and post-accident conditions are identical in all meaningful respects, the plaintiff has failed to carry his burden of proving causation.
 
 Id.
 
 (citing
 
 Juneau,
 
 94-0903 at p. 8, 647 So.2d at 1300).
 

 Differentiating between damages caused by an accident and damages caused by the normal progression of a plaintiffs pre-existing condition often presents complex legal and medical issues.
 
 Chavers,
 
 04-0992 at p. 9, 902 So.2d at 395 (citing
 
 Stein, supra,
 
 § 11.1). In this case, as Defendants point out, the causation issue is further complicated because mental and psychological problems do not lend themselves to easy analysis regarding their origin, severity, or duration. Although ex
 
 *273
 
 pert medical testimony is indispensable in some cases to prove or disprove causation, “a finding on the issue of causation is not necessarily contingent upon the substance of expert medical testimony.”
 
 Greening v. Bell,
 
 28,689, p. 3 (La.App. 2 Cir. 9/25/96), 681 So.2d 36, 38. “Expert medical testimony is only required when the conclusion regarding medical causation is one that is not within common knowledge.”
 
 Newsome v. New Orleans Saints,
 
 08-311, p. 7 (La.App. 5 Cir. 10/14/08), 996 So.2d 637, 640 (citing
 
 Chavers, supra); Hutchinson v. Shah,
 
 94 0264, p. 3 (La.App. 1 Cir. 12/22/94), 648 So.2d 451, 452 (citing
 
 Lasha,
 
 625 So.2d at 1005).
 

 Whether the accident caused the plaintiffs injuries, whether the plaintiff is entitled to invoke the
 
 Housley
 
 presumption, and whether the plaintiff established a causal link between the accident and an aggravation of a pre-existing condition are all factual determinations reviewable under the manifest error standard of review.
 
 American Motorist Ins. Co. v. American Rent-All, Inc.,
 
 579 So.2d 429, 433 (La.1991)(causation);
 
 Detraz v. Lee,
 
 05-1263, p. 9 (La.1/17/07), 950 So.2d 557, 562-63 (causation and applicability of the
 
 Housley
 
 presumption);
 
 Touchard v. SLEMCO Elec. Found.,
 
 99-3577 (La.10/17/00), 769 So.2d 1200 (aggravation of pre-existing condition). Likewise, credibility determinations, including evaluating the testimony of expert witnesses, are factual findings governed by the manifest error standard of review.
 
 Sportsman Store of Lake Charles, Inc. v. Sonitrol Security Systems of Calcasieu, Inc.,
 
 99-0201, p. 6 (La.10/19/99), 748 So.2d 417, 421. Simply stated, an appellate court is required to “give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.’ ”
 
 Dixon,
 
 02-1364 at p. 9, 842 So.2d at 485 (quoting
 
 Canter v. Koehring Co.,
 
 283 So.2d 716, 724 (La.1973)).
 

 The pivotal issue presented in this case is whether the trial court’s findings of causation were manifestly erroneous. To resolve this issue, it is necessary to review the pertinent evidence regarding Mrs. Williams’ condition during three pertinent periods: (i) before the accident — her prior condition; (ii) immediately after the accident-the recovery period (if any); and (iii) subsequent to the accident — the subsequent injury.’
 
 Chavers, supra,
 
 (citing
 
 Stein, supra,
 
 § 11.1). The pertinent testimony regarding Mrs. Williams’ condition during the three periods was provided by two witnesses: her son, Lucky Williams, and Defendants’ expert neurologist, Dr. Domangue.
 

 Dr. Domangue’s testimony
 

 Dr. Domangue acknowledged that he never treated or saw Mrs. Williams; rather, the sole basis for his expert testimony was his review of her medical records from LSUMC, Mobile Infirmary, and Sea Breeze. Dr. Domangue testified that | inMrs. Williams was admitted to LSUMC following the accident with a condition of delirium; her symptoms were acute agitation and confusion.
 

 Based on the information in the medical records, Dr. Domangue’s assessment of Mrs. Williams’ condition at the time of her admission to LSUMC was that she had a base line of moderate dementia. He identified the primary source upon which he based his assessment as a social worker’s handwritten note. That note stated:
 

 The patient lives with her son, who is presently in custody. Talked with the patient’s neighbor who states the patient lives alone and is able to care for herself.
 
 *274
 
 Friends assist with food as well as other daily needs. Her son comes in once a month to pay bills.
 

 Dr. Domangue also based his assessment upon quotes contained in the medical records, including a statement in the discharge summary that a family member had reported Mrs. Williams had “previous moderate dementia.” Dr. Domangue testified that it was mentioned several times in the medical records that Mrs. Williams had memory problems before the accident. Nonetheless, Dr. Domangue acknowledged that, other than the quotes reportedly given by various family members to various medical personnel, “a base line was not really established in terms of her overall condition.” He also acknowledged that he found it difficult to establish Mrs. Williams’ base line at the time of her admission to LSUMC based on his review of the medical records.
 

 Dr. Domangue defined chronic dementia as a ' progressive disease which affects short term memory. He noted that an afflicted patient can have both good and bad days; the bad days eventually start to outnumber the good ones. He further noted that patients with dementia have a very low threshold to become agitated and can easily go into a state of delirium. Dr. Domangue explained that [n delirium causes a patient to become very agitated, confused and combative, which was how Mrs. Williams presented when she was admitted to LSUMC. He further explained that delirium be precipitated by multiple events including a change in the environment or a change in the metabolic status such as low potassium level, which Mrs. Williams’ LSUMC medical records indicated that she had when she was admitted there.
 

 Dr. Domangue testified that the 3.9 centimeter subdural bleed Mrs. Williams suffered as a result of the accident was very common in a patient with moderate dementia. He explained that “as a patient with dementia ages their brain starts to shrink” and any type of trauma, including a simple fall, can cause a subdural bleed. He further explained that the area of Mrs. Williams’ brain that was affected — the left occipital lobe — is the part of the brain that controls vision. “Memory and alertness, all the other factors that were [a]ffected as a result of her injury are more located in the temporal [lobe] ... area of the brain,” which he found based on his review of Mrs. Williams’ MRI and CAT scans were not damaged.
 

 When asked if any of Mrs. Williams’ problems after her release from LSUMC “had anything at all to do with the accident,” Dr. Domangue answered: “No, I don’t think so.” He explained that when Mrs. Williams was discharged from LSUMC two weeks after the accident her medical condition must have been stable and that she must have returned to being very close to her base line. Continuing, he noted that if her condition was worse than her base line level she would have required a much higher level of medical care (such as a nursing home or assisted living facility) and would not have been discharged to go home with her son.
 
 [7]
 

 | ,2After being discharged from LSUMC, Mrs. Williams lived with her son in Mobile for roughly three months. She then started developing difficulties in terms of agitation and sleeping. Dr. Domangue described this as “very common of a patient with Alzheimer’s Disease” and noted that it is a common course for such a patient to
 
 *275
 
 have “an up and down, waxing arid waning course.” Insofar as the admission to Mobile Infirmary, he testified as follows: “I think this admission to Mobile [Infirmary] had nothing to do [with the accident]. I think she recovered from the injury. And I think she went back to her base line and then what occurred after that is a very classic case of someone with chronic dementia.”
 

 Insofar as Mrs. Williams transfer from Mobile Infirmary to Sea Breeze, Dr. Do-mangue testified that this was the result of a “chronic degeneration of her disease.” He explained that “unlike when she got discharged from LSU[MC] going home with the son, now she required a higher level of care prompting a nursing home.” He further explained that for patients with chronic dementia “it is a very common occurrence for patients one month to look like they can go home and live by themselves and four and five months later now they need twenty-four hour assistance.” Dr. Domangue agreed that this appeared to be “a classic case of dementia progressing to a serious stage.”
 

 Based on his review of the report from the MRI taken at the Mobile Infirmary about three months after the accident, Dr. Domangue testified as follows:
 

 • The MRI “showed the old bleed that was present on the cat scan but also shows something I think is very important. It did not show any signs of an infarct, so meaning that the bleed she sustained on the injury that prompted the admission did not damage any brain tissue.”
 

 • The MRI “showed that the bleed was actually resolving and there was just remnants of the blood that was left over from three months prior.”
 

 11S* The MRI showed the contusion was still there “[w]hich is very common after a bleed, it takes probably on average one year for blood to re-sorb.” He noted this “fits the typical progression.”
 

 • The MRI showed that “the amount of atrophies, the amount of shrinkage of the brain, was also consistent with someone who had mild to moderate dementia, meaning that the process that was in place had been in place before the accident. This had been going on for at least a couple of years.”
 

 Based on the MRI results, Dr. Domangue opined that there was no indication of any permanent injury or disability as a result of the accident.
 

 Mr. Williams’testimony
 

 Mr. Williams testified that he came from Mobile to New Orleans about twice a month to check on his mother, who basically lived by herself. He explained that his brother (who was in jail at the time of the accident) lived with his mother, but did not take care of his mother. Mr. Williams testified that his brother was “in and out the house, drugs and whatever,” and he and his wife took care of his mother and made sure she was okay. Insofar as his mother’s neighbors, Mr. Williams explained that they looked out for his mother, but they did not physically take care of her. He further explained:
 

 They would check on her, in fact everybody in the neighborhood would keep an eye on her, but she functioned by herself, in terms of helping her clean or feeding her or anything, cleaning the house or anything, it wasn’t that, they just — they knew what my situation was and they just kept her — kept an eye on her, but they didn’t physically help her with anything.
 

 According to Mr. Williams, his mother was able to get around fine before the accident. For this reason, he was certain that at the time of the accident his mother
 
 *276
 
 was not walking with either a cane or a walker. Mr. Williams stated that his mother not only was able to walk, but also was able to physically travel around town by herself before the accident. He pointed out that the distance from his mother’s house to Carrollton Avenue was three blocks. His mother was able to |14walk that distance and then board a street car to get to Tulane Avenue and Broad Street, the location where the accident occurred. His mother would travel to that location to put some money on the account of his brother (her other son) who was in jail. He noted that she also was able to go to the neighborhood grocery store and to handle her own money.
 

 Mr. Williams denied being aware that his mother suffered from any dementia before the accident. He explained that “[bjecause in order to determine that she had to have gone to a hospital. And we weren’t aware of anything.” He testified that his mother had never been in a hospital before this accident. When advised of an entry in his mother’s LSUMC discharge record of a report given by an unidentified family member that his mother previously suffered from moderate dementia, he denied being the source of that report or being aware of it. He also denied being the source of a nutritionist’s note that Mrs. Williams had lost weight over a period of time before the accident. He testified that his mother had no trouble eating before the accident.
 

 Mr. Williams last came to New Orleans to check on his mother about two weeks before the accident. On his way back to Mobile, he dropped his mother off in the same location where the accident occurred. At that time, he characterized his mother as in good health, and he described her overall condition as follows:
 

 [S]he functioned as well as any 88 year old person could, she — like when we came home I would cash her check but she handled her own monies. She would go to the store. She would pay her insurance premium. And in fact the day that she was hit she had traveled from the house at 1230 Cambrón in New Orleans to the area where she was hit. She had to walk about three blocks to the — to Carrollton to get the street car to go down on to Tulane Avenue. I think she had to make two transfers to get there. My mother, for 88 years old, she was in excellent shape because to go up — to get up and down on those street cars requires a little effort even for a young person. And the fact that my mother was in the area where she was when she was hit | ^should let you know that she was able to get around and do things for herself. She was still cooking, washing, cleaning house, doing all the things that she was supposed to do.
 

 Mr. Williams described the change in his mother’s condition from before to after the accident as follows:
 

 [S]he went from being self sufficient, taking care of herself [cooking, cleaning, doing all the things that someone her age would do], taking care of business, in fact, the day that she was hit she was down — downtown in that area taking care of some business for my brother. After the accident, for a long time my mother couldn’t walk, didn’t have really any body functions. We and the folks at Sea Breeze basically had to do everything for her.... [Ajfter that it was always something, either hospitals, or nursing homes, or it changed my wife and myself because we had to devote all of our attention to my mother at that time.
 

 Following the accident, he noted that his mother had to relearn how to eat, to talk, and to walk. She therefore required a lot of rehabilitation services, including physi
 
 *277
 
 cal therapy, occupational therapy, and speech therapy. He indicated that his mother never fully regained her speech capacity. He testified that “after the accident she stayed in the bed — she couldn’t move.” Because his mother had always been an independent person and taken care of herself, Mr. Williams testified that it was the “hardest thing in the world for her to be confined to that bed.”
 

 Based on the evidence presented, the trial court, as noted earlier, made three findings regarding causation. Defendants do not dispute the first finding — that as a result of this accident Mrs. Williams suffered a closed head injury, which included a left occipital injury, a 3.9 centimeter contusion and subdural bleeding. Rather, Defendants dispute the other two findings — that these injuries caused Mrs. Williams to remain hospitalized or institutionalized until her death and that she lost her ability to maintain herself and her mobility.
 

 | ^Defendants emphasize that the only expert who interpreted Mrs. Williams’ post-accident medical records was their expert, Dr. Domangue, who testified that the MRI taken about three months after the accident revealed that Mrs. Williams’ head injury (occipital hematoma) had substantially resolved. Based on Dr. Domangue’s testimony, Defendants contend that any injuries Mrs. Williams suffered as a result of the accident had resolved themselves before she was admitted to Mobile Infirmary about three months after the accident. Defendants submit that Dr. Do-mangue’s testimony established Mrs. Williams did not suffer any permanent brain injury and that the accident caused neither Mrs. Williams’ subsequent decline in health nor her need for medical and custodial care after she was discharged from LSUMC. According to Defendants, Mrs. Williams’ subsequent treatment and nursing home admission were the inevitable result of her pre-existing chronic dementia (or Alzheimer’s disease) and not the result of the accident.
 

 In support of their position, Defendants also cite the trial court’s statement in its reasons for judgment — albeit in connection with its finding of comparative fault — that Dr. Domangue testified before the accident Mrs. Williams “suffered from mild to moderate dementia, which could have robbed her of the ability to take cognizance of the Stewart vehicle.” Defendants contend that the trial court’s acceptance of Dr. Domangue’s testimony as to the pre-acci-dent onset of Mrs. Williams’ dementia cannot be reconciled with its findings of causation and its quantum awards.
 

 The Williams Family counters that even though the trial court accepted Dr. Do-mangue’s statement that Mrs. Williams may have had dementia before the accident, her son, Lucky Williams, testified, without contradiction, that his mother li7had neither been treated for nor diagnosed with dementia before the accident. The Williams Family stresses that Mr. Williams was the only witness with personal knowledge of Mrs. Williams’ pre-acci-dent condition. Dr. Domangue neither saw nor treated Mrs. Williams. Rather, his testimony was based solely on the hearsay quotes in the medical records from unnamed family members. Moreover, there were no pre-accident medical records for Dr. Domangue to review because Mrs. Williams had never been hospitalized in over fifty years before the accident. The Williams Family thus contends that Dr. Domangue’s opinion regarding Mrs. Williams’ pre-accident base line condition was nothing but speculation.
 

 The Williams Family further counters that Defendants’ argument ignores the following evidence in the record establishing the applicability of the
 
 Housley
 
 presump
 
 *278
 
 tion: (1) before the accident Mrs. Williams was in good physical and mental health for her age — eighty-eight years old at the time of the accident; (2) she undisputedly sustained physical injuries in the accident — a traumatic brain injury and brain contusion as well as a lacerated lip; (3) commencing immediately after the accident, she experienced symptoms that continuously manifested themselves until her death consistent with the diagnosis of traumatic brain injury and brain contusion; and (4) there is at least a reasonable possibility that her injuries were caused by the accident. The William Family thus contends that Defendants had the burden to rebut the presumption by proving another more reasonable explanation for all of Mrs. Williams’ post-accident injuries and that the accident neither caused nor contributed to her post-accident condition. They contend the trial court correctly concluded that Defendants failed to meet their burden of proof. Alternatively, the Williams Family contends that even assuming hsMrs. Williams had some pre-existing mental or physical condition (which they deny), the “egg-shell” plaintiff principle would apply.
 

 Louisiana courts have recognized the appropriateness of applying the
 
 Housley
 
 presumption and the “egg-shell” plaintiff principle to aid plaintiffs in establishing causation in cases, such as this one, involving physical injuries that cause mental harm.
 
 Calcagno v. Kuebel, Fuchs Partnership,
 
 01-691 (La.App. 5 Cir. 11/14/01), 802 So.2d 746;
 
 LaSalle v. Benson Car Co.,
 
 00-1459 (La.App. 5 Cir. 1/30/01), 783 So.2d 404;
 
 see also
 
 Candice E. Renka, Note,
 
 The Presumed Eggshell Plaintiff Rule: Determining Liability When Mental Harm Accompanies Physical Injury,
 
 29 T. Jefferson L.Rev. 289 (Spring
 
 2007)(“Renka”).
 
 In such cases, “[t]he comparison of pre- and post-injury functionality is the key to determining whether a plaintiff was mentally healthy before the physical injury.”
 
 Renka, supra
 
 at 301. “Looking to a plaintiffs lifestyle to evaluate his or her mental health prevents courts from creating an unattainable standard for mental health that very few plaintiffs could live up to.” Id. at 302. Even if a plaintiff cannot establish he or she was in good mental health and thus unable to invoke the
 
 Housley
 
 presumption, a comparison of the plaintiffs pre- and post-injury functionality can still be used to determine whether the defendant aggravated the plaintiffs preexisting condition.
 
 Renka, supra
 
 at 309-10 (discussing
 
 Touehard, supra,
 
 in which such a comparison was made, but it was found the plaintiff “was unable to establish that her symptoms intensified after the accident”).
 

 To illustrate, the court in
 
 Calcagno, supra,
 
 applied these principles to decide the issue of whether an accident caused age-related changes in an elderly plaintiffs (Ms. Calcagno’s) brain to become symptomatic. Ms. Calcagno fell outside the defendant’s business where she was going to play bingo. The defendant argued that 119the trial court’s award of $30,000.00 in damages was excessive because Ms. Cal-cagno’s only injury was a fractured tibia.
 
 [8]
 
 The defendant further argued that Ms. Calcagno failed to prove her memory problems were caused by the accident; instead, the defendant argued that her memory problems were caused by her age — ninety-one at the time of the accident — and not the accident itself. Ms. Calcagno’s treating physician was the only medical expert to testify. He opined that her memory problems were caused by age-related changes in the brain. He further opined that the age-related changes in her brain were asymptomatic before the accident,
 
 *279
 
 but became symptomatic as a result of the accident.
 

 Affirming the trial court’s finding of causation and damages, the appellate court in
 
 Calcagno, supra,
 
 noted the lack of any contradictory evidence regarding the effects of the accident on Ms. Calcagno’s condition. The appellate court further noted that the doctor’s testimony regarding her memory problems being asymptomatic before the accident was corroborated by the lay witnesses’ testimony. Ms. Calcagno’s niece, who lived with Ms. Cal-cagno, and her friends, who saw her daily, described her condition before the accident as mentally “sharp.” Moreover, the appellate court noted that the leg injury Ms. Calcagno suffered caused “a once independent and mobile woman to become dependent on ambulatory devices.”
 
 Calcagno,
 
 01-691 at p. 11, 802 So.2d at 752.
 

 Similar to
 
 Calcagno, supra,
 
 the record in this case reflects that before the accident Mrs. Williams’ dementia — age-related changes to her brain — was neither diagnosed nor being treated. Although Dr. Domangue testified that he believed the onset of her dementia preceded the accident, his assessment of her base line | gpcondition when she was admitted to LSUMC was based solely on references in the medical records attributed to unidentified individuals. Dr. Domangue acknowledged that he found it difficult to assess Mrs. Williams’ base line condition based on his review of the medical records, and he testified that he did not “know what this patient’s base line was outside of the medical records, the notes that were mentioned.” Dr. Domangue also acknowledged that despite notes in the medical record “a base line was not really established in terms of her overall condition.” As the Williams Family pointed out, Dr. Domangue had no pre-accident medical records to review because Mrs. Williams had never been hospitalized in over fifty years before the accident.
 

 As noted, Dr. Domangue identified as the principal source of his assessment regarding Mrs. Williams’ base line condition of dementia a social worker’s handwritten note regarding a conversation with Mrs. Williams’ neighbors. Addressing the help the neighbors provided Mrs. Williams, Mr. Williams explained that the neighbors did not physically provide care for her but merely looked out for her since they knew she lived by herself and that he lived out of town. Mr. Williams testified that his mother was able to live independently before the accident.
 

 Although Dr. Domangue testified that Mrs. Williams was medically stable when she was discharged from LSUMC, the medical records reflect that at that time she required continuous, twenty-four hours per day supervision because she had a high risk for falling and had “severe cognitive deficits.” The medical records further reflect that nursing home placement was considered during Mrs. Williams’ hospital stay at LSUMC, but her son opted to attempt to care for his mother in his home in Mobile. Indeed, the medical records from Sea Breeze reflect that even |2i after Mrs. Williams was admitted to the nursing home her son made several attempts to care for his mother at his home, resulting in multiple admissions and discharges.
 
 [9]
 

 
 *280
 
 Defendants’ reliance on the Williams Family’s failure to present any medical expert testimony to establish causation is misplaced. The circumstances of this case present a situation in which resort to lay testimony to establish causation was warranted. The record is devoid of any pre-accident medical records from Mrs. Williams. Indeed, a notation dated February 26, 2004, in the medical records from Mobile Infirmary corroborates Mr. Williams’ testimony regarding his mother’s lack of prior medical treatment; the notation reads: “[s]he apparently has never been sick and has no other medical problems. The family reports that she has never been to a physician.” As noted, Dr. Domangue’s testimony was based solely on his review of the post-accident medical records. The trial court thus was entitled to rely on Mr. Williams’ lay testimony in determining Mrs. Williams’ pre-accident condition and functionality.
 

 A comparison of Mrs. Williams’ pre-and post-accident functionality supports the trial court’s findings of causation. As the Williams Family points out, even if Mrs. Williams had some degree of dementia before the accident, “she was
 
 fully functioning
 
 before the accident.” She was living independently and able to move about without assistance. In contrast, “she was
 
 fully incapacitated
 
 — mentally and physically — after the accident.” Following the accident, Mrs. | ^Williams required the services of speech, occupational, and physical therapists. She also required constant supervision by either family members or the staff of a hospital or nursing home. The record reflects that from the time of the accident until her death, Mrs. Williams resided either with her son in Alabama, as a hospital in-patient, or as a nursing home resident. At no time following the accident was she able to return home and live independently, which she was able to do before the accident. We thus find no manifest error in the trial court’s findings of causation.
 

 DAMAGES
 

 A trial court has great discretion when assessing damages.
 
 Youn v. Maritime Overseas Corp.,
 
 623 So.2d 1257 (La.1993). In reviewing a general damage award, the first inquiry is “whether the particular effects of the particular injuries to the particular plaintiff are such that there has been an abuse of the ‘much discretion’ vested in the judge or jury.”
 
 Joseph v. City of New Orleans,
 
 02-1996 (La.App. 4 Cir. 3/5/03), 842 So.2d 420 (quoting 1 Frank L. Maraist and Harry T. Lemmon,
 
 Louisiana Civil Law Treatise: Civil Procedure
 
 § 14.14 (1999)). The standard of review for abuse of discretion in awarding general damages is “difficult to express and is necessarily non-specific.”
 
 Cone v. National Emergency Services, Inc.,
 
 99-0934, p. 8 (La.10/29/99), 747 So.2d 1085, 1089. Only when the award, in either direction, is beyond that which a reasonable trier of fact could assess for effects of a particular injury to a particular plaintiff under particular circumstances, should an appellate court increase or reduce award.
 
 Coco v. Winston Industries, Inc.,
 
 341 So.2d 332 (La.1977). In the
 
 Youn
 
 case, which is the seminal case on this standard, the Louisiana Supreme Court articulated the standard as follows: “the discretion vested in the trier of fact is ‘great,’ and even | g!vast, so that an appellate court should rarely disturb an award of general damages.”
 
 Youn,
 
 623 So.2d at 1261. This is not such a rare case.
 

 
 *281
 
 Defendants’ contention that the trial court erred in awarding $450,000.00 in general damages is based upon their argument that there was no causal relationship between the accident and the aggravation of Mrs. Williams pre-existing dementia. In the same vein, Defendants, as noted earlier, contend that any injuries Mrs. Williams suffered as a result of the accident had resolved themselves before she was admitted to Mobile Infirmary about three months after the accident and that her general damages should be reduced accordingly. For the reasons discussed above, we find both of these arguments unpersuasive.
 

 The record reflects that Mrs. Williams spent the last four and a half years of her life unable to live independently as she was able to do before the accident. The medical records document the pain and suffering that she endured during that period. Applying the
 
 Youn
 
 standard, we cannot conclude that the trial court’s general damage award was an abuse of discretion. We thus find it unnecessary to resort to a review of damage awards made in other cases.
 
 See Theriot v. Allstate Ins. Co.,
 
 625 So.2d 1337, 1340 (La.1993) (holding that after an appellate court determines that the fact-finder abused its discretion, it can then resort to a review of prior awards to determine the appropriate modification of the award).
 

 Insofar as the trial court’s award of $45,138.42 in special damages (reduced by comparative fault), Defendants acknowledge that this sum represents the total of all billings found in the medical records for Mrs. Williams’ treatment and care at LSUMC, Mobile Infirmary, and Sea Breeze. Defendants do not dispute the reasonableness of these expenses. Rather, Defendants contend that their liability should be limited to amount of the LSUMC charges, which totaled $18,355.53, | ¡^reduced by comparative fault. Again, Defendants’ argument is that Mrs. Williams’ injuries she suffered in the accident were substantially resolved by the time she presented for treatment at Mobile Infirmary. Thus, they contend that the charges for Mobile Infirmary as well as the subsequent charges from Sea Breeze were not the result of the accident. As discussed above, the trial court’s finding that the accident caused Mrs. Williams’ subsequent hospitalization at Mobile Infirmary and institutionalization at Sea Breeze is supported by the record. Thus, the trial court’s special damage award is affirmed.
 

 DECREE
 

 For the forgoing reasons, the judgment of the trial court is amended to provide that it is rendered against only Deputy Stewart and Sheriff Gusman in his official capacity. As amended, the judgment of the trial court is affirmed.
 

 AMENDED AND AFFIRMED AS AMENDED.
 

 [1]
 

 . Defendants do not dispute on appeal the trial court’s factual finding that the vehicle Deputy Stewart was driving struck Mrs. Williams. The record contains three different estimates as to how fast Deputy Stewart was going at the time he struck her. Deputy Stewart estimated that he was going two to three miles per hour. In the police report, Officer Jason Lewis listed the speed as ten miles an hour. The medical records state that the vehicle that hit Mrs. Williams was traveling five miles per hour.
 

 [2]
 

 . Officer Jason Lewis testified that he did not remember if Mrs. Williams walked with the assistance of a cane or a walker. As noted elsewhere, Mrs. Williams’ son, Lucky Williams, testified that his mother was able to get around fine before the accident; thus, he was certain that at the time of the accident his mother was not walking with either a cane or a walker.
 

 [3]
 

 . As noted elsewhere, Mrs. Williams was admitted and discharged from Sea Breeze on multiple occasions before she died.
 

 [4]
 

 . The original petition refers to the Orleans Parish Sheriff’s Office as the defendant; however, the caption of the original suit, the amending petition, and the judgment all refer to the Orleans Parish Sheriff’s Department as the defendant. We thus refer to the Department as the named defendant. Although the City of New Orleans also was named as a defendant, Mrs. Williams voluntarily dismissed her claim against the City before trial.
 

 [5]
 

 . Defendants also introduced a copy of the photograph of Mrs. Williams that Captain Louque and his partner, Officer Sidney Holt, took at the accident scene. The parties stipulated that Officer Holt’s testimony would have been the same as Captain Louque's testimony. The parties also stipulated to the medical records that the Williams Family introduced. Finally, the parties stipulated to Dr. Do-mangue’s qualifications as an expert in the field of neurology.
 

 [6]
 

 . The trial court in its reasons for judgment stated the size of the contusion to be nine centimeters. However, it is not disputed that the correct size of the contusion was 3.9 centimeters.
 

 [7]
 

 . As discussed later in this opinion, contrary to Dr. Domangue's characterization of Mrs. Williams as stable when she was discharged from LSUMC, Mrs. Williams’ medical records reflected that she required continuous, twenty-four hours per day supervision.
 

 [8]
 

 . The parties stipulated that damages were below the jury threshold level of $50,000.00.
 

 [9]
 

 . The record reflects the following chronology of admissions and discharges:
 

 • Admission to Sea Breeze (from Mobile Infirmary) on 2/26/04 and discharge home to family on 3/17/04;
 

 • Admission to Sea Breeze on 5/3/04 and discharge to Mobile Infirmary on 8/26/04;
 

 • Admission to Sea Breeze on 9/08/04 and discharge to Mobile Infirmary on 1/3/06;
 

 • Admission to Sea Breeze on 1/17/06 and discharge home to family on 7/9/07
 

 
 *280
 
 • Admission to Sea Breeze on 8/7/07 and discharge home to family on 8/29/07;
 

 • Admission to Sea Breeze on 1/17/08; and
 

 • Mrs. William died while a resident at Sea Breeze on May 13, 2008.