JOY COSSICH LOBRANO, Judge.
| defendants, Dupuy Storage and Forwarding Corporation and Dupuy Storage and Forwarding L.L.C., appeal two trial court judgments: (1) the October 29, 2012 judgment in favor of plaintiff, Danilo Sabil-lon, in the amount of $4,661,333.00, plus judicial interest and costs to be taxed by the trial court from the date of judicial demand until paid, and (2) the January 2, 2013 judgment denying defendants’ motion for new trial, motion for judgment notwithstanding the verdict and, alternatively, motion for remittitur of the damages award.[1] For reasons that follow, we affirm.
On February 3, 2010, the plaintiff, an independent commercial truck driver who was in the business of transporting loads of cargo, arrived with a delivery of cargo at a warehouse owned by Dupuy Storage and Forwarding L.L.C. (hereinafter preferred to as “Dupuy.”)[2] An employee of Dupuy used a forklift to. unload the cargo transported by plaintiff. During the unloading process, the load fell off the forklift and struck a piece of lumber, which became airborne and struck plaintiff in the head, causing severe injuries. Plaintiff was 46 years old at the time of the accident. Plaintiff filed suit against Dupuy and its insurer, Max Specialty Insurance Company, alleging that plaintiffs injuries were caused solely by the negligence of Dupuy and its employee(s).
Following trial, a jury found Dupuy solely at fault for plaintiffs injuries, and awarded plaintiff the following damages, totaling $4,661,333.00:
(1) Physical injury, pain and suffering (past and future) — $1,303,333.00
(2) Mental anguish, pain and suffering (past and future) — $996,667.00
(3) Permanent disability, if any— $670,833.00
(4) Loss of enjoyment of life (past and future) — $862,500.00
(5) Medical expenses (past and future) — $128,000.00
*710 (6) Past lost wages and future loss of earnings/loss of earning capacity— $700,000.00
The trial court adopted the jury verdict, and rendered judgment in favor of plaintiff and against Dupuy and Max Specialty Insurance Company, in the amount of $4,661,333.00, plus judicial interest and costs to be taxed by the court from the date of judicial demand until paid. Dupuy and Max Specialty Insurance Company subsequently filed motions for new trial and for judgment notwithstanding the l3verdict to reduce the damages award, and alternatively, for remittitur of the damages award. The trial court denied those motions, and this appeal followed.
On appeal, Dupuy raises two assignments of error:
(1)The jury manifestly erred in its award of $700,000.00 in past lost wages and future loss of earnings/loss of earning capacity; and
(2)The jury manifestly erred in its award of $3,833,333.00 in general damages.
Dupuy did not appeal the finding that it was 100% at fault for this accident. With regard to the award of $700,000.00 for past lost wages and future loss of earnings/loss of earning capacity, Dupuy argues that the plaintiff is not now, nor is he likely to be in the future, permanently and totally disabled. According to Dupuy, the evidence at trial established that plaintiff returned to work driving a truck a few weeks after the accident, and is able to work in gainful employment at wages equal to or above those he was earning at the time of the accident. Plaintiff responds that the jury did not manifestly err in awarding $700,000.00 in economic damages in light of the medical evidence of plaintiffs ongoing decline and the testimony of experts whom Dupuy stipulated were qualified.
Elizabeth Bauer, who was accepted as an expert in vocational rehabilitation, testified on behalf of plaintiff. She testified that she interviewed plaintiff and did a comprehensive review of the medical records relating to plaintiff, including the reports of two neuropsychologists. After reviewing this information and evaluating plaintiff, Ms. Bauer concluded that plaintiffs skills are specific to driving 18-wheel trucks, and are not transferrable to other types of work. Given |4her additional opinion that plaintiff has no transferrable skills, Ms. Bauer’s opinion is that plaintiff is unemployable. Ms. Bauer noted that plaintiffs 2011 income of $56,123.00 closely coincides with the annual earning rate of $57,100.00 that her research showed could be earned by Louisiana truck drivers. According to Ms. Bauer, plaintiff would have continued to earn that amount but for his injuries sustained in the accident.
Dr. Shael Wolfson, an expert forensic economist who testified on behalf of plaintiff, stated that plaintiff sustained $4,690.00 in lost wages. Dr. Wolfson further testified that assuming the earnings figures stated by Elizabeth Bauer, plaintiffs loss of earning capacity would be $520,967.00 if he worked to the age of 60, or $1,012,028.00 if calculated from the time of trial until the age of 67 when plaintiff would be eligible to receive Social Security benefits.
Dr. Larry Stokes, who was accepted as an expert in the field of vocational rehabilitation, testified on behalf of Dupuy. He stated that he interviewed plaintiff, and reviewed accident and medical records and depositions relating to plaintiff. His opinion is that plaintiff has some transferrable skills, most of which involve driving. Dr. Stokes testified that plaintiff could drive a pickup truck, car or van, and perform sedentary to light duty work, such as being an escort driver, a delivery driver or courier. *711 He also stated that plaintiff could probably perform some jobs that do not involve driving, such as assembly work and janitorial work. Dr. Stokes’ opinion is that plaintiff did not sustain a loss of earning capacity as a result |sof the accident, and can continue to earn wages similar to those earned prior to. the accident.
Kenneth Boudreaux, the expert economist testifying on behalf of Dupuy, testified that given Dr. Stokes’ opinion regarding plaintiff’s employability, plaintiff does not have any loss of earning capacity. However, when asked to use Ms. Bauer’s calculation that plaintiff could earn $57,100.00 per year, Mr. Boudreaux testified that if plaintiff cannot work at all, his present value future lost earnings would total $672,600.00 if plaintiff worked until the age of 60.
Dupuy also points to the testimony of plaintiffs neurologist, Dr. Morteza Shams-nia, who stated that plaintiff can no longer drive an 18-wheel truck, but could drive a car or a pickup truck. But Dr. Shamsnia also said that he is not a vocational rehabilitation expert, and would not make any assessment as to whether or not plaintiffs skills as a driver of an 18-wheel truck were transferrable to other types of employment.
“The jury’s determination of the amount, if any, of an award of damages, including lost earning capacity, is a finding of fact.” Ryan v. Zurich American Ins. Go., 07-2312, p. 7 (La.7/1/08), 988 So.2d 214, 219. “Credibility determinations, including evaluating expert witness testimony, are for the trier of fact.” Jones v. Harris, 04-0965, p. 15 (La.App. 4 Cir. 2/2/05), 896 So.2d 237, 246 (citing Sportsman Store of Lake Charles, Inc. v. Sonitrol Security Systems of Calcasieu, Inc., 99-0201, p. 6 (La.10/19/99), 748 So.2d 417, 421). “Such credibility ^determinations are factual findings governed by the well-settled manifest error standard of review.” Id.
Although the jury was presented with conflicting testimony on the issue of plaintiffs loss of future earning capacity, there was a reasonable basis for the jury’s award of $700,000.00 for past lost wages and future loss of earnings/loss of earning capacity. This award was not manifestly erroneous.
Dupuy next argues that the jury erred in its award of $3,833,333.00 in general damages. Plaintiff was awarded this amount for damages including physical and mental pain and suffering (past and future), permanent disability and loss of enjoyment of life (past and future).
In Williams v. Stewart, 10-0457 (La. App. 4 Cir. 9/22/10), 46 So.3d 266, this Court summarized the law regarding an appellate court’s review of an award of general damages as follows:
A trial court has great discretion when assessing damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993). In reviewing a general damage award, the first inquiry is “whether the particular effects of the particular injuries to the particular plaintiff are such that there has been an abuse of the ‘much discretion’ vested in the judge or jury.” Joseph v. City of New Orleans, 02-1996 (La.App. 4 Cir. 3/5/03), 842 So.2d 420 (quoting 1 Frank L. Maraist and Harry T. Lemmon, Louisiana Civil Law Treatise: Civil Procedure § 14.14 (1999)). The standard of review for abuse of discretion in awarding general damages is “difficult to express and is necessarily non-specific.” Cone v. National Emergency Services, Inc., 99-0934, p. 8 (La.10/29/99), 747 So.2d 1085, 1089. Only when the award, in either direction, is beyond that which a reasonable trier of fact could assess for effects *712 of a particular injury to a particular plaintiff under particular circumstances, should an appellate court increase or reduce award. Coco v. Winston Industries, Inc., 34 |7 So.2d 332 (La.1977). In the Youn case, which is the seminal case on this standard, the Louisiana Supreme Court articulated the standard as follows: “the discretion vested in the trier of fact is ‘great,’ and even vast, so that an appellate court should rarely disturb an award of general damages.” Youn, 623 So.2d at 1261.
Id., pp. 22-23, 46 So.3d at 280.
The record reflects that plaintiff worked as an independent contractor truck driver. The owner of a trucking company for whom plaintiff frequently worked described plaintiff as very dependable before the accident. Following the accident, plaintiff continued to drive 18-wheelers for this same trucking company for a brief period of time, but the owner of the company stated that plaintiff got lost on several trips, failed to properly secure his loads, and failed to complete his logbooks, things that plaintiff had never done prior to the accident. Based on these incidents, the owner of the trucking company decided to no longer employ plaintiff.
Plaintiff testified that since the accident, he has had a buzzing sound in his head that he hears at all times when he is awake. His neck feels like it is broken, which causes him to have difficulty sleeping. He has pain from the base of his neck all the way down the entire length of his back, and this pain is getting worse over time. He developed vision problems since the accident. He has suffered from memory loss. His injuries have adversely affected his relationships with his partner and children. Plaintiffs partner corroborated plaintiffs testimony.
Dr. William Alden, an expert in internal medicine, occupational medicine, sports medicine, physical medicine and rehabilitation, testified that he began treating plaintiff shortly after the accident. On plaintiffs first visit, less than a week after the accident, Dr. Alden’s clinical impression was that plaintiff suffered Ra head injury with loss of consciousness, post traumatic headaches, cervical, thoracic and lumbar pain, facial laceration and left-sided shoulder pain. An MRI performed on plaintiffs lumbar and cervical spine revealed a bulging disc at C5-C6 and a bulging disc at C4-C5 with a tear in the bulge. The MRI also revealed some facet arthrosis, which Dr. Alden described as inflammation in the small joints next to the herniation. The MRI of the lumbar spine revealed a bulging at L3-L4 and a herniation at L4-L5. Dr. Alden related all of these conditions to the February 3, 2010 accident. Based on the results of the MRI, Dr. Alden advised plaintiff to consult an orthopedist or a neurologist because of Dr. Alden’s opinion that plaintiff was a surgical candidate.
Dr. Lawrence Glorioso, an expert in neuroradiology, diagnostic radiology, radi-ologic pathology, and vascular and inter-ventional radiology, testified that he interpreted cervical, lumbar and brain MRIs performed on plaintiff. He stated that because the plaintiff still had significant neck pain at trial — over two years after the accident — the pain will not resolve without surgery. Dr. Glorioso also stated that plaintiff is a surgical candidate for the herniation at L4-L5, and such surgery could alleviate his pain in that area. Dr. Glorioso compared a CT scan taken of plaintiffs brain on the date of the accident with an MRI taken of the brain almost two years later in December 2011. That MRI was the first one taken of the plaintiffs brain after the accident, and was ordered by Dr. Frank Johnston, whose testimony is summarized below. Dr. Glorioso testified that while the CT scan was essentially *713 normal with regard to the brain (the scan did show that plaintiff suffered an acute nasal fracture,) the MRI of the brain taken almost two years later showed a significant level of brain atrophy and scarring consistent with what is known as coup con-trecoup injury. He testified that this condition is associated with a closed-jhead9 injury, and that brain atrophy is a gradual process. A second MRI of plaintiff’s brain that was taken four months after the first MRI showed that plaintiff’s clinical symptoms had gotten progressively worse. Dr. Glorioso described plaintiffs traumatic brain injury as a permanent problem, which usually gets worse for most people with this type of condition. He said the brain atrophy being experienced by plaintiff explains his memory problems. He further stated that there is currently no surgical procedure available to correct this type of traumatic brain injury.
Dr. Frank Johnston, an expert in orthopedics, testified that he first treated plaintiff in December 2010. After examining plaintiff and reviewing the lumbar and cervical spine MRI results, Dr. Johnston concluded that plaintiff had post-traumatic carpal tunnel syndrome, neck discomfort as a result of an annular tear and bulging disc in his neck and a disc herniation in his low back. He related all of these problems to the accident. Dr. Johnston recommended the MRI of the brain that plaintiff had in December 2011 based on plaintiffs complaints of dizziness, blurred vision, light-headedness and a persistent humming/buzzing noise in his head. Dr. Johnston agreed with Dr. Glorioso’s interpretation of the MRIs. Dr. Johnston testified that he does not perform spinal surgery. He recommended that plaintiff have epidural steroid injections, and if those did not provide pain relief, he could then consult a surgeon to discuss his surgical options.
Dr. Susan Andrews, an expert in the field of neuropsychology, testified that she evaluated plaintiff in May 2012, and reviewed the report of the neuropsychologist retained by Dupuy to evaluate plaintiff. Based on her testing and evaluation, Dr. Andrews determined that plaintiffs IQ has dropped 25 points since the accident. Testing also showed that plaintiffs sense of smell has been |inimpaired. Dr. Andrews’ impressions of plaintiff are that he has cognitive deficits that are consistent with damage to the brain, and an adjustment disorder with some depression because of the chronic pain and the fact that he was having difficulty doing his job. She gave him a diagnosis of borderline intellectual functioning. Her opinion is that these impairments are related to his coup con-trecoup injury that has caused permanent brain damage. She said plaintiffs condition will probably get worse over time, likely resulting in early dementia, which could require 24 hour a day care if it progresses to a certain point.
Dr. Morteza Shamsnia, an expert in neurology and psychiatry, electro diagnostic medicine, clinical neuropsychology and sleep medicine, first treated plaintiff in April 2012 for neurological complaints. Those complaints included vision changes, neck pain, low back pain, unusual noises in his head and memory loss. After viewing the brain MRI taken in 2011, Dr. Shams-nia noted abnormalities and ordered another brain MRI. At Dr. Shamsnia’s recommendation, plaintiff underwent EMG and nerve conduction studies. The results of those studies indicated carpal tunnel syndrome and a pinched/damaged nerve in his neck. Dr. Shamsnia reviewed the MRI of the lumbar spine and stated that it showed L4-L5 disc herniation. He also suspected bulging in the L5-S1 area and there was clear evidence that the left L5 nerve root has been pinched and is under pressure. Dr. Shamsnia related plaintiffs *714 pinched nerve in his neck and herniation in his back to the February 2010 accident. His opinion is that plaintiff will need neck surgery. Dr. Shamsnia stated that the CT scan taken of plaintiffs brain on the day of the accident showed no atrophy, which indicates he had no preexisting condition that would account for the atrophy that appeared on subsequent MRIs. He testified that the 2011 MRI showed atrophy that was not |npresent in the 2010 CT scan, and the 2012 MRI showed that the atrophy had worsened since the 2011 MRI. The brain MRIs also showed gliosis, or scarring. Both MRIs showed coup contre-coup brain injury as well. Dr. Shamsnia testified that plaintiffs brain atrophy will probably get worse, but will not get better. Stated another way, he said that plaintiff has permanent, lifelong brain damage from his coup contrecoup injury.
Dupuy presented the testimony of Dr. John Allen Davis, Jr., an expert in orthopedic medicine and surgery. Dr. Davis performed an independent medical evaluation of plaintiff. He reviewed the medical records, test results and depositions, and examined plaintiff. His opinion is that plaintiffs disc problems that appeared on diagnostic tests are the result of degenerative changes that are not uncommon for a man his age. He disagreed with Dr. Glori-oso’s opinion that plaintiff has a herniation at L4-L5. Dr. Davis does not believe that the neck and back pain being experienced by plaintiff is related to the accident. He further stated that the carpal tunnel syndrome seen in plaintiff was probably related to his occupation, but was not related to the accident. Dr. Davis would not recommend surgery for plaintiff, but would recommend injections for his disc problems. In his opinion, the MRI and imaging studies performed on plaintiff did not show significant trauma.
Dr. Kevin Greve, an expert in the field of clinical neuropsychology, also testified on behalf of Dupuy. He performed a neu-ropsychological evaluation of plaintiff, and reviewed his medical records, including the report from neuropsychologist, Dr. Susan Andrews. He said he could not ascertain from the records if plaintiff actually lost consciousness after the accident, but the records do indicate that he sustained a concussion. Dr. Greve concluded that while plaintiff |12was not malingering, the physical and mental issues he continued to have at the time of trial, demonstrated problems with concentration, depression and slowed mental speed. He stated that he does not believe that these mild, nonspecific symptoms are still related to the accident at this point.
On cross-examination, Dr. Greve conceded that plaintiffs psychological state, his physical symptom presentation, and attention/concentration problems probably are related to the accident. He also agreed that plaintiff sustained a mild traumatic brain injury from this accident. He also agreed that physical signs like dizziness, vision disturbance, and buzzing sounds in the head can be physical manifestations of a traumatic brain injury. Dr. Greve admitted that brain atrophy takes time to develop following an injury. He estimated plaintiffs pre-accident IQ could have been as high as 82, and was currently around 65.
Given the evidence presented, and applying the standard set forth in Youn v. Maritime Overseas Corp., supra, we cannot conclude that the trier of fact abused its vast discretion in its general damages award to plaintiff. Dupuy’s argument that the amount awarded to plaintiff for general damages was excessive is based on evidence supporting its contention that the injuries suffered by plaintiff in the accident were much less serious than those *715 alleged by plaintiff. However, the record also contains ample evidence in support of plaintiffs claim that the injuries he suffered in the February 2010 accident have significantly damaged his life, causing him ongoing physical and mental pain and suffering, loss of enjoyment of life and permanent disability. Even though Dupuy offered evidence that conflicted with the evidence presented by plaintiff, there was a reasonable basis in the record to support the general damages award in this case. Therefore, we find it unnecessary to resort to a review of damage awards made in other cases. See |13 Williams, 10-0457, p. 23, 46 So.3d at 281 (citing Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993) (where the court held that after an appellate court determines that the fact-finder abused its discretion, it can then review prior awards to determine the appropriate modification of the award)).
For the reasons stated above, the trial court judgments of October 29, 2012 and January 2, 2013 are affirmed.
AFFIRMED.

. Defendant Max Specialty Insurance Company was also cast in judgment with Dupuy Storage and Forwarding Corporation and Du-puy Storage and Forwarding L.L.C., and joined in the motion for appeal. However, following the order granting a suspensive appeal to all three defendants, Max Specialty reached a settlement with plaintiff, and plaintiff entered into a joint motion with Max Specialty to dismiss Max Specialty from the litigation with prejudice. The order dismissing Max Specialty Insurance Company with prejudice was signed on January 31, 2013.

. Dupuy Storage and Forwarding L.L.C. is the successor entity to Dupuy Storage and Forwarding Corporation. Both entities were named as defendants in this lawsuit.