# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

## 23-689

CHARLES SMITH AND JODENISE SMITH

VERSUS

STANLEY CEASAR, JR., D/B/A
CEASAR'S DUMP TRUCK SERVICE,
ET AL.

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2019-4470-D
HONORABLE ROBERT L. WYATT, DISTRICT JUDGE

**********

## JONATHAN W. PERRY
## JUDGE

**********

Court composed of Elizabeth A. Pickett, Van H. Kyzar, and Jonathan W. Perry, Judges.

AFFIRMED, IN PART;
REVERSED, IN PART.

**James T. Rivera**
**Bryan D. Scofield**
**Jessica W. Marchand**
**Scofield & Rivera, LLC**
**Post Office Box 4422**
**100 E. Vermilion, Suite 301**
**Lafayette, Louisiana 70502**
**(337) 235-5353**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Clear Blue Specialty Insurance Company and**
    **Stanley Ceasar, Jr. d/b/a Ceasar's Dump Truck Service**


**Gregory T. Stevens**
**Monica Vela-Vick**
**Phelps Dunbar LLP**
**Post Office Box 4412**
**Baton Rouge, Louisiana 70821-4412**
**(225) 346-0285**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Indian Harbor Insurance Company**


**M. Benjamin Alexander**
**Derrick G. Earles**
**David C. Laborde**
**Mary K. Cryar**
**Laborde Earles Law Firm, LLC.**
**1901 Kaliste Saloom Road**
**Post Office Box 80098**
**Lafayette, Louisiana 70598-0098**
**(337) 261-2617**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
    **Charles and Jodenise Smith**

**PERRY, Judge.**

Stanley Ceasar, Jr. ("Mr. Ceasar") doing business as Ceasar's Dump Truck Services, Clear Blue Specialty Insurance Company ("Clear Blue"), and Indian Harbor Insurance Company ("Indian Harbor") (hereinafter collectively referred to as "Defendants"), suspensively appeal the trial court's judgment, incorporating the jury's verdict, which awarded damages to Charles Smith ("Mr. Smith") and Jodenise Smith ("Mrs. Smith") (hereinafter collectively referred to as "Plaintiffs"), for the damages suffered when Mr. Smith was involved in a motor vehicle accident. Additionally, Plaintiffs answered the appeal to challenge the trial court's reduction of Mrs. Smith's award for loss of consortium. For the following reasons, we affirm in part and reverse in part.

## FACTS AND PROCEDURAL HISTORY

On November 6, 2018, Mr. Smith, while in the course and scope of his employment, was driving a 2002 Freightliner tanker truck owned by his employer, Wastewater Specialties ("Wastewater"), when a collision occurred between his vehicle and a dump truck being driven by Mr. Ceasar. Plaintiffs filed suit against Mr. Ceasar d/b/a Ceasar's Dump Truck Services, and their liability insurer, Clear Blue, seeking damages for Mr. Smith's personal injuries and Mrs. Smith's loss of consortium.

On March 8, 2021, Plaintiffs added Indian Harbor, an excess insurer to Mr. Smith's employer, Wastewater, as an additional defendant through a supplemental and amending petition. Indian Harbor filed its answer and affirmative defenses, admitting that it issued Policy Number US00085155L118A, an excess policy, to Wastewater, which provided commercial liability coverage subject to certain terms, conditions, limitations, and exclusions for the period of June 30, 2018 to June 30, 2019. Indian Harbor further claimed its policy contained an uninsured/underinsured

motorist ("UM") rejection form which eliminated UM coverage under the policy issued to Wastewater.

In February 2022, Plaintiffs filed a motion for summary judgment arguing certain ambiguities in the above-mentioned UM rejection form invalidated Wastewater's purported rejection of UM coverage. Indian Harbor also filed a motion for summary judgment seeking to dismiss Plaintiffs' claims against it on the basis that its excess commercial liability policy did not provide UM coverage because Wastewater had validly rejected such coverage on its UM rejection form.

Following a hearing on the parties' cross motions, the trial court orally ruled that the UM coverage form submitted by Indian Harbor which purportedly reflected Wastewater's rejection of UM coverage on behalf of Wastewater was invalid. Indian Harbor subsequently sought supervisory review from this court, which was denied. *Smith v. Ceasar*, 22-267 (La.App. 3 Cir. 6/3/22) (unpublished writ opinion).

The matter was tried before a jury from October 11 through October 17, 2022. Plaintiffs presented evidence contending that, as a result of the accident, Mr. Smith suffered physical injuries requiring three separate operations, as well as a traumatic brain injury which affects his mental capabilities.

At the conclusion of trial, the jury rendered a verdict in favor of Plaintiffs, finding that Mr. Ceasar was 100% at fault for causing the accident,[1] and awarding a total of $5,107,609.23 in damages to Plaintiffs. Damages to Mr. Smith were awarded in the following amounts:

| | |
|---|---|
| Past Medical Expenses | $360,459.23 |
| Future Medical Expenses | $470,250.00 |
| Past Physical Pain and Suffering | $300,000.00 |
| Future Physical Pain and Suffering | $500,000.00 |
| Past Mental Pain and Suffering | $675,000.00 |
| Future Mental Pain and Suffering | $700,000.00 |

---

[1] Liability is not at issue on appeal.

| | |
|---|---|
| Past Loss of Enjoyment of Life | $500,000.00 |
| Future Loss of Enjoyment of Life | $500,000.00 |
| Scarring and Disfigurement | $0 |
| Past Lost Earnings/Earning Capacity | $285,346.00 |
| Future Lost Earnings/Earning Capacity | $341,554.00 |

Mrs. Smith was awarded $475,000.00 for loss of consortium.

The trial court entered a judgment in conformity with the jury's verdict on November 3, 2022.[2]  Defendants timely filed a Motion for Judgment Notwithstanding the Verdict ("JNOV") and/or Motion for New Trial and/or Remittitur on December 13, 2022.  Therein, Defendants challenged the jury's awards for Mr. Smith's general damages, future medical expenses, and future lost earnings/earning capacity, as well as for Mrs. Smith's loss of consortium.  The trial court denied the JNOV but granted, in part, the Motion for New Trial and/or Remittitur as to Mrs. Smith's loss of consortium claim only, reducing her damages from $475,000.00 to $100,000.00.[3]  A judgment to this effect was issued on March 10, 2023.

Defendants then perfected suspensive appeals reiterating their challenges to the jury's awards for Mr. Smith's general damages, future medical expenses, and future lost earnings/earning capacity.  Additionally, Indian Harbor contends the trial court erred when it granted a summary judgment in Plaintiffs' favor on the issue of Wastewater's rejection of UM coverage, as well as the trial court's ruling granting Plaintiffs' motion in limine which resulted in limiting testimony from Defendants' expert in neurosurgery, Dr. Thomas Bertuccini ("Dr. Bertuccini").

---

[2] This judgment reflected a reduction of the amount recoverable for past medical expenses from $360,459.23, to the amount actually paid by the workers' compensation intervenor, which is $273,389.91.

[3] A remittitur is an alternative to a new trial with the consent of the non-moving, opposing party.  La.Code Civ.P. art. 1814.  If the opposing party rejects the remittitur, the new trial is held.

Plaintiffs answered Defendants' appeals. Therein, Plaintiffs contend the trial court erred when it reduced Mrs. Smith's award for loss of consortium.

## ASSIGNMENTS OF ERROR

On appeal, Mr. Ceasar and Clear Blue filed a brief, and Indian Harbor filed a brief. Defendants assert the same three assignments of error:

(1)   The [j]ury abused its discretion in awarding future pain and suffering and future medical expenses to [Mr.] Smith when the recommended procedures fell outside [Mr.] Smith's life expectancy.

(2)   The [j]ury abused its discretion in awarding future lost earnings and/or earning capacity without taking into consideration [Mr.] Smith's ability to work.

(3)   The jury abused its discretion by awarding [Mr.] Smith $3,175,000.00 in past and future general damages as such an award is excessive.

In its separately filed brief, Indian Harbor asserts two additional assignments of error:

(4)   The [trial] court erred in finding UM coverage under the policy was not properly rejected by Wastewater in accordance with Louisiana law.

(5)   The [trial] court erred by impermissibly limiting the testimony of Defendants' expert Dr. Thomas Bertuccini.

In answer to Defendants' appeals, Plaintiffs assert the trial court's reduction of Mrs. Smith's award for loss of consortium was manifestly erroneous.

## APPELLANTS' ARGUMENTS

Defendants argue that although experts testified Mr. Smith will more probably than not need future adjacent level surgeries on his neck and back and a future shoulder surgery, all of the recommended future surgeries fall at or outside of Mr. Smith's life expectancy. Thus, Defendants assert the jury abused its discretion in awarding Mr. Smith future medical expenses in the sum of $470,250.00, and future

4

general damages in the sum of $1.7 million because Mr. Smith's need for additional surgeries will not occur during his lifetime.

Defendants contend the jury abused its discretion in awarding Mr. Smith $351,554.00 in damages for future lost earnings/earning capacity. Defendants allege the jury failed to take into consideration the testimony of two of Mr. Smith's treating physicians whom Defendants claim testified that Mr. Smith could perform sedentary work and would benefit emotionally and mentally from doing so.

Defendants also assert the amount awarded in general damages to Mr. Smith is excessive. Defendants allege the jury abused its discretion in finding Mr. Smith's injuries and post-accident condition warrant a general damage award totaling $3.175 million.

Additionally, Indian Harbor argues that surgical intervention as to Mr. Smith's cervical and lumbar spine was not reasonable or medically necessary, and that the jury was unable to make this determination on their own because the trial court improperly limited the testimony of Dr. Bertuccini, Defendants' medical expert. Indian Harbor further argues the trial court erred in ruling Wastewater did not effectuate a valid rejection of UM coverage in its excess commercial liability policy.

**APPELLEES' POSITION**

Plaintiffs assert that the evidence established that Mr. Smith will need three additional surgeries, notwithstanding life expectancy statistics. Plaintiffs argue, in brief, Defendants' arguments concerning Mr. Smith's future medical expenses and future general damages "cherry-pick the evidence in an effort to downplay Mr. Smith's injuries, exploit his age, and overstate his post-accident abilities." Plaintiffs, however, allege the complete evidence contradicts Defendants' arguments and,

5

further, confirms that the jury's decision was reasonable and not an abuse of its vast discretion.

Plaintiffs contend that the damages awarded by the jury are supported by the law and the evidence. They assert the amounts awarded by the jury are all well within its vast discretion and are supported by prior awards in similar cases.

Plaintiffs allege Defendants filed multiple expert witness lists, each of which expressly limited the scope of Dr. Bertuccini's opinions to future care and disability. Thus, Plaintiffs argue the trial court did not abuse its discretion in not allowing opinion testimony from Dr. Bertuccini on the subjects of causation or Mr. Smith's past medical care.

Plaintiffs further argue the trial court did not err in finding that the UM rejection form relied upon by Indian Harbor does not comply with the dictates of Louisiana law. Thus, Plaintiffs contend there is UM coverage under the excess commercial liability policy issued by Indian Harbor to Wastewater.

Finally, Plaintiffs contend the trial court erred in granting Defendants' motion for remittitur, thereby reducing the loss of consortium award rendered by the jury. Plaintiffs argue the trial court's reduction of Mrs. Smith's loss of consortium damages was manifestly erroneous.

## LAW AND DISCUSSION

### *Assignment of Error No. 5—Limitation of Dr. Thomas Bertuccini's testimony*

We begin by reviewing Indian Harbor's assignment of error concerning the trial court's ruling granting Plaintiffs' motion in limine at a hearing held immediately prior to the start of the jury trial. Indian Harbor argues the trial court erred in limiting the testimony of Dr. Bertuccini and depriving the jury from hearing his expert opinions on whether the accident herein caused Mr. Smith's injuries and whether

6

surgical intervention on his cervical and lumbar spine was reasonably or medically necessary.

The record reflects that in February 2022, Defendants filed a motion to compel an additional medical exam ("AME") under La.Code Civ.P. art. 1464. Defendants sought a medical examination of Mr. Smith by Dr. Bertuccini. Also in February 2022, and again in June 2022, Defendants filed expert witness lists, noting that Dr. Bertuccini "may [be called] . . . as a medical expert with respect to any future medical treatment and/or permanent restrictions related to [Mr. Smith's] alleged injuries sustained in the accident at issue."

Mr. Smith was eventually examined by Dr. Bertuccini on August 8, 2022. During his trial deposition on September 22, 2022, Dr. Bertuccini offered testimony regarding the reasonableness or necessity of Mr. Smith's past medical care and opined on whether the past medical care was related to the accident.

Plaintiffs filed two motions. The first, a *Daubert* Motion and Motion in Limine to Exclude Certain Testimony of Dr. Bertuccini, was filed on September 28, 2022. Therein, Plaintiffs sought to exclude Dr. Bertuccini's testimony altogether, arguing his methodology was unreliable—his opinion is based upon his own patients, none of whom underwent a lumbar fusion or a four-level cervical fusion— and, thus, his testimony would be irrelevant.

The second, a Motion to Strike, and Alternative Motion in Limine, was filed on October 3, 2022. Therein, Plaintiffs sought to strike Dr. Bertuccini's opinions not related to Mr. Smith's future medical care and permanent restrictions as beyond the scope of Defendants' own expert designations. Plaintiffs alleged that Defendants' expert witness designation never expressed that Dr. Bertuccini would opine on the subjects of accident causation or on the reasonableness or necessity of Mr. Smith's past medical care. Thus, Plaintiffs argued Defendants violated the

mandate of La.Code Civ.P. art. 1428(1) to seasonably supplement discovery responses with respect to identifying each person expected to be called as an expert witness at trial, the substance of and the subject matter on which the witness is expected to testify.

In response, Defendants sought to strike Plaintiffs' *Daubert* motion as untimely. Citing La.Code Civ.P. art. 1425(F), Defendants asserted that a motion "to determine whether a witness qualifies as an expert or whether the methodologies employed by such witness are reliable . . . shall be filed not later than sixty days prior to trial" and, furthermore, the trial court "shall rule on the motion not later than thirty days prior to the trial." Defendants alternatively argued Plaintiffs' motion failed to sufficiently establish the methodologies utilized by Dr. Bertuccini were unreliable.

Defendants requested denial of Plaintiffs' motion to strike, arguing that their identification of Dr. Bertuccini on their expert witness list was not intended to limit his evaluation of Mr. Smith's future treatment. According to Defendants, this is clear as the description includes the necessity of Dr. Bertuccini to examine all of Mr. Smith's alleged injuries to determine his permanent restrictions, if any.

Arguments on Plaintiffs' motions were heard on October 11, 2022, immediately prior to the start of jury selection. The trial court denied Plaintiffs' request to eliminate Dr. Bertuccini's testimony; however, it granted Plaintiffs' request to limit Dr. Bertuccini's testimony. The trial court ruled Dr. Bertuccini could testify "regarding the future medical and permanent restrictions" but he could not criticize Mr. Smith's prior procedures or opine regarding causation. Consequently, the video deposition of Dr. Bertuccini was redacted for trial to exclude opinions on the reasonableness and/or necessity of Mr. Smith's past medical care.[4]

---

[4] The unredacted deposition of Dr. Bertuccini was proffered into the record.

On appeal, Indian Harbor contends the trial court's ruling, made on the morning of trial, impeded the fair presentation of evidence to the jury, resulting in prejudice to Defendants. In brief, Indian Harbor asserts that the trial court's ruling could create a "chilling effect" by:

> effectively encouraging plaintiffs and plaintiffs' counsel to have surgeries pre-litigation due to the trial court's view that if the clinical evaluation is done after a medical procedure, the expert would not be able to go back and comment on whether or not the procedure was appropriate or if it was done correctly.

Thus, Indian Harbor argues the limitations on Dr. Bertuccini's testimony were erroneous.

In contrast, Plaintiffs assert the issue is not whether any defendant can ever offer expert testimony regarding pre-treatment and or pre-surgery recommendations. Rather, the question here is whether Defendants should be permitted to say one thing pretrial and then another at trial. Plaintiffs contend the trial court correctly concluded the answer is no.

Plaintiffs further argue that in Louisiana, a plaintiff is entitled to recover the full cost for treatment—even over treatment or unnecessary treatment—for injuries resulting from the negligence of a tortfeasor, unless the defendant alleges and proves the treatment was incurred in bad faith. *See Jones v. Progressive Sec. Ins. Co*, 16-463 (La.App. 3 Cir. 12/29/16), 209 So.3d 912. Plaintiffs assert Defendants have made no such allegation and offered no evidence in this matter, rendering Dr. Bertuccini's criticisms of Mr. Smith's treatment irrelevant.

"On appeal, a trial court's admission or exclusion of evidence is subject to an abuse of discretion review." *Libersat v. J & K Trucking, Inc.*, 00-192, p. 11 (La.App. 3 Cir. 10/11/00), 772 So.2d 173, 179, *writ denied*, 01-458 (La. 4/12/01), 789 So.2d 598. Likewise, motions in limine are reviewed under the abuse of discretion standard. *Noel v. Noel*, 15-37 (La.App. 3 Cir. 5/27/15), 165 So.3d 401, *writ denied*,

9

15-1121 (La. 9/18/15), 178 So.3d 147. "Courts have regularly exercised their inherent powers by imposing sanctions for failing to timely supplement discovery responses." *Bozeman v. State*, 34,430, p. 10 (La.App. 2 Cir. 4/4/01), 787 So.2d 357, 365, *writ denied*, 01-1341 (La. 6/29/01), 794 So.2d 813.

Louisiana Code of Civil Procedure Article 1428(1) provides:

A party is under a duty seasonably to supplement his response with respect to any question directly addressed to the identity and location of persons having knowledge of discoverable matters, and the identity of each person expected to be called as an expert witness at trial, the subject matter on which he is expected to testify, and the substance of his testimony.

Defendants' expert witness lists specifically limited Dr. Bertuccini's opinions "to any future medical treatment and/or permanent restrictions related to Plaintiffs' alleged injuries sustained in the accident at issue." It was not until Dr. Bertuccini's deposition—less than three weeks before trial was to begin—that Defendants' intent to expand the scope of Dr. Bertuccini's testimony was made known to Plaintiffs. Based upon Defendants' failure to fulfill the duty to timely, and accurately, supplement their expert witness list, we find no abuse of discretion in the trial court's ruling. The trial court properly limited the testimony offered by Dr. Bertuccini to the scope identified in Defendants' expert designations. This assignment of error asserted by Indian Harbor lacks merit.

*Damages*

Before tackling the merits of the remaining assignments of error, further development of the trial evidence is necessary. The evidence shows the facts of the underlying accident as being a collision between a tanker truck being driven by Mr. Smith and a dump truck bring driven by Mr. Ceasar on November 6, 2018.

At trial, Plaintiffs presented testimony and evidence as to Mr. Smith's treatment with: Dr. Lon Baronne ("Dr. Baronne"), an orthopedic surgeon (spine);

10

Dr. Matthew Williams ("Dr. Williams"), an orthopedic surgeon (shoulder); Dr. Darren Strother ("Dr. Strother"), a neuropsychologist; Dr. David Weir ("Dr. Weir"), a neurologist; Dr. Doris Nevin ("Dr. Nevin"), a medical psychologist; and Dr. James White ("Dr. White"), an otorhinolaryngologist ("ENT").[5] The evidence showed that Mr. Smith had four-level neck fusion surgery, two-level back fusion surgery, and shoulder replacement surgery. Mr. Smith was also diagnosed as having sustained a traumatic brain injury ("TBI") with associated chronic headaches and tinnitus, which negatively affected his cognitive and psychological abilities. Both Plaintiffs testified as to how Mr. Smith's injuries negatively affected their marriage and significantly reduced his quality of life.

Mr. Smith testified the accident caused him to experience pain in his right shoulder, right thigh, lower back, right forearm, right knee,[6] and right hip. A few days after the accident, Mr. Smith also began to experience ringing in his ears, or tinnitus.

Mr. Smith testified that as a result of his injuries caused by the accident, he underwent three surgeries: cervical fusion, lumbar fusion, and shoulder replacement. According to Mr. Smith, his neck pain was eliminated by surgery, and his back pain decreased sixty to seventy percent after surgery on his lower back; however, Mr. Smith noted that although his back pain is tolerable now, sitting or standing for long periods causes pain. As to his right shoulder, Mr. Smith testified his shoulder pain was eliminated by surgery, but he does not have as much mobility in his right shoulder as he did before the accident.

---

[5] This is not an exhaustive list of all evidence and testimony introduced and accepted into the record. Further, though not specifically indicated, each medical witness was accepted as an expert in their respective field.

[6] Though he ultimately had knee surgery, Mr. Smith sought no damages for his right knee.

As to tinnitus, Mr. Smith recalled experiencing ringing in his ears approximately four or five days after the accident. He stated the ringing is constant and causes him to experience headaches and dizziness. Mr. Smith has tried hearing aids recommended by doctors but complained that the white noise caused by the hearing aids gives him headaches and causes insomnia. Though he was not wearing hearing aids at trial, Mr. Smith testified he has not ruled out using hearing aids in the future.

Mr. Smith also detailed having memory issues—he is often forgetful during conversations, losing his train of thought. He also described feeling depressed, anxious, and admitted he is occasionally short-tempered—traits he did not experience before the accident.

At the time of his accident, Mr. Smith was driving a truck, working as a Class A Hazardous Waste operator for Wastewater. Prior to working for Wastewater, Mr. Smith worked in banking for almost thirty years. After retiring from banking, he obtained his Class A commercial drivers' license, worked as a school bus driver, and has even worked security at a casino. He also served as Mayor of Oberlin for three years.

Mr. Smith testified it was his plan to work until the age of seventy-two, had the accident not occurred. At trial in 2022, Mr. Smith turned sixty-six. Although he stated he wished he could return to work, Mr. Smith testified his physical and mental injuries made him unable to work. Mr. Smith also testified that after his accident, he and his wife could no longer afford to live in Lake Charles. They moved in with his wife's parents in Oberlin because his wife also had to quit working to care for him.

Before the accident, Mr. Smith described how he was healthy and very active, in his work life, but especially in his family life. Though he can still drive and attend

his grandchildren's sporting events, Mr. Smith testified his wife does most of the driving, and he can no longer actively play or participate in sports with his grandchildren like he could before the accident. He also relayed how the accident and his resulting injuries have limited his ability to hunt, fish, and help with household chores, and have made his sexual relationship with his wife nonexistent. Although he is still able to travel with his wife, Mr. Smith testified he has to be pushed in a wheelchair in airports, and what he can do when he travels now is restricted significantly compared to what he could do before the accident.

Mrs. Smith also testified about the impact her husband's accident had on their lives.[7] She described their lifestyle before the accident as normal, but very active, especially in the lives of their children and grandchildren. Like Mr. Smith, Mrs. Smith was working at the time of the accident. Although she enjoyed the job, which allowed her to travel around the country, she quit working to care for her husband.[8] Mrs. Smith testified their lives have been financially impacted due to Mr. Smith's inability to work and her need to care for him full time.

Because of Mr. Smith's traumatic brain injury, Mrs. Smith handles her husband's affairs, such as driving him where he needs to go, accompanying him to medical appointments, wheeling him in a wheelchair when they travel, scheduling and remembering his appointments, and helping him effectively communicate by regularly redirecting his thoughts and conversations. According to Mrs. Smith, though they can and do still travel, they are limited, especially in their visits with their children and grandchildren, due to Mr. Smith's lack of stamina.

---

[7] Mr. and Mrs. Smith have been married since 1979.

[8] Mrs. Smith had retired from working for the Federal Bureau of Prisons. At the time of Mr. Smith's accident, she had a part time job with the American Correctional Association, which entailed traveling around the United States to audit prisons.

Dr. Baronne, Mr. Smith's spine surgeon, performed an anterior cervical discectomy and fusion from C3 to C7 with a posterior instrumentation ("neck surgery") on November 20, 2019. In September 2020, Dr. Baronne performed an anterior lumbar interbody fusion, along with a lateral interbody fusion on L4-L5 and L5-S1 ("back surgery"). Dr. Baronne testified Mr. Smith's neck surgery was recommended to avoid Mr. Smith's neurological deterioration becoming permanent. After the neck surgery, Mr. Smith improved, which indicated to Dr. Baronne the surgery was the proper procedure to perform. After the back surgery, Mr. Smith's leg pain resolved, and he was able to function more, which again indicated to Dr. Baronne the surgery was required and successful. Dr. Baronne testified that Mr. Smith's neck and back surgeries were medically necessary and, more probably than not, related to the accident.

Regarding future treatment, Dr. Baronne opined that Mr. Smith will more than likely need both an additional neck and back surgery, based on data regarding the rate of adjacent segment degeneration. He testified Mr. Smith will more than likely need another neck surgery in seventeen to twenty years, and another back surgery in fifteen to seventeen years. However, Dr. Baronne explained Mr. Smith may need those surgeries sooner because "someone with a four-level fusion, for somebody who has a total hip arthroplasty, with revision and an abnormal gait, it may even be sooner than that, unfortunately."[9]

Dr. Williams, Mr. Smith's shoulder surgeon, performed an unconstrained right shoulder replacement on March 29, 2021.[10] Dr. Williams testified his initial examination of Mr. Smith revealed limited range of motion. He reviewed an MRI

_____

[9] Mr. Smith's hip surgery occurred prior to the accident herein.

[10] Dr. Williams recommended that Mr. Smith undergo back surgery first because Mr. Smith would be unable to use his shoulder for over six months after this surgery.

of Mr. Smith's shoulder, which showed advanced arthritis that would have pre-existed the accident. However, since Mr. Smith reported that he had no shoulder issues prior to the accident, Dr. Williams testified Mr. Smith's post-accident symptomatic arthritis, which was the reason he operated, was more likely than not caused by the accident.

Regarding future treatment, Dr. Williams opined there is a statistical risk that the plastic socket component will become loose or painful. He testified Mr. Smith will more than likely need shoulder revision surgery by the age of eight-five.

Dr. Strother,[11] Mr. Smith's neuropsychologist, diagnosed Mr. Smith with mild TBI, complicated versus uncomplicated, unspecified neurocognitive disorder, and adjustment disorder with mixed anxiety and depression. Dr. Strother testified that Mr. Smith had evidence of cognitive impairments, including difficulty with attention, memory, efficiency of thinking, and difficulty adjusting emotionally. He opined Mr. Smith's diagnoses were more likely than not related to the November 2018 accident.

Dr. Weir,[12] Mr. Smith's neurologist, diagnosed Mr. Smith with post-concussive syndrome on May 28, 2019, six months after the accident. Dr. Weir testified that Mr. Smith complained to him of suffering headaches, short-term memory loss, difficulty controlling his emotions, difficulty sleeping, and trouble focusing. Dr. Weir concluded Mr. Smith has TBI with neurocognitive impairments, short-term memory problems, difficulty focusing and concentrating, and some language difficulties. His diagnosis was supported by an MRI DTI (magnetic resonance imaging diffusion tensor imaging), as well as Dr. Strother's evaluation

---

[11] Dr. Strother was accepted as an expert in the field of neuropsychology and/or traumatic brain injury.

[12] Dr. Weir was accepted as an expert in the field of neurology, specifically with an expertise in the diagnosis and treatment of mild traumatic brain injury.

finding neurocognitive disorder. Dr. Weir testified Mr. Smith's headaches did not fully resolve post-neck surgery; thus, he attributed them to posttraumatic headaches originating from the brain, not neck.

Dr. Weir testified that two-years post-accident, Mr. Smith had made at least 95% of the progress he was expected to make. Although Mr. Smith had improved some, Dr. Weir testified that more likely than not, Mr. Smith will never fully get back to his pre-accident condition. He also opined that Mr. Smith's TBI, and prognosis, were more likely than not related to the accident.

Mr. Smith was referred to Dr. Nevin, a psychologist, by Dr. Weir, for depression and anxiety. Dr. Nevin testified that Mr. Smith reported a constant depressed mood and that he was easily distracted, frequently fatigued, and suffered a drop in functioning. She diagnosed Mr. Smith with a depressive disorder with anxiety, and signs involving cognitive functions and awareness. Dr. Nevin opined that Mr. Smith suffered from depression and an overlay of anxiety due to the changes in his life because of the accident.

Mr. Smith was seen by Dr. White, an ENT, for tinnitus—a constant high frequency pitch, as well as a pulsatile component (a throbbing sound like the heartbeat)—in both ears. Dr. White recommended a trial of amplification and tinnitus masking with hearing aids. Though Mr. Smith experienced hearing loss prior to the accident, Dr. White testified the only reason Mr. Smith needs hearing aids is to cope with noticeable and bothersome tinnitus which did not exist before the accident. Moreover, Dr. White testified that tinnitus can be caused by trauma; thus, it was his opinion that Mr. Smith's tinnitus was more likely than not related to the accident.

16

***Assignment of Error No. 1—Future Medical Expenses & Future Pain and Suffering***

Returning to the assignments of error, Defendants first urge that the jury's awards for future medical expenses and future pain and suffering are an abuse of discretion. Mr. Smith was awarded $470,250.00 for future medical expenses and a total of $1.7 million for future general damages—comprised of $500,000.00 for future physical pain and suffering; $700,000.00 for future mental pain and suffering; and $500,000.00 for future loss of enjoyment of life.

"The proper standard for determining whether a plaintiff is entitled to future medical expenses is proof by a preponderance of the evidence the future medical expense will be medically necessary." *Menard v. Lafayette Ins. Co.*, 09-1869, p. 13 (La. 3/16/10), 31 So.3d 996, 1006. As the *Menard* court further explained, although an award for future medical expenses must be established with some degree of certainty, such awards "generally do not involve determining the amounts, but turn on questions of credibility and inferences," therefore, much discretion is afforded to the factfinder's evaluation of expert testimony. *Id*. (quotation omitted). "Where there are two permissive views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Id*. at 1007.

Defendants argue the recommended future surgeries allegedly fall at or outside of Mr. Smith's statistical life expectancy. Thus, they contend the jury's award for future medical expenses was an abuse of discretion which should be reduced and, consequently, so should his future general damage awards.

The basis for Defendants' contentions stems from the testimony of Dr. Shelly Savant ("Dr. Savant"), Plaintiffs' expert life care planner. Dr. Savant explained that she formulated a life care plan for Mr. Smith based on a life expectancy age of eighty-three. Mr. Smith was sixty-five years old on the date he was examined by

Dr. Savant in May 2022,[13] and on the date her life care plan was generated in September 2022. Dr. Savant included the costs of three additional surgeries—neck, back, and shoulder—as recommended by Drs. Baronne and Williams in the life care plan she formulated for Mr. Smith.[14]

The calculation of Mr. Smith's future medical expenses was formulated by Jason Schellhaas, Plaintiffs' expert certified public accountant ("CPA").[15] Mr. Schellhaas' calculation of future medical expenses included those sums associated with the additional neck, back, and shoulder surgeries, as well as with post-surgery care in relation to each of the future surgeries included in Dr. Savant's life care plan.

Defendants allege the jury failed to take into consideration Mr. Smith's age when it awarded future damages. Defendants specifically point to Dr. Williams' testimony that Mr. Smith would need shoulder revision surgery by the age of eighty-five, and Dr. Baronne's testimony that Mr. Smith would need another neck surgery in seventeen to twenty years—between the ages of eighty-three and eighty-six—and another back surgery in fifteen to seventeen years—between the ages of eighty-one and eighty-three. Thus, Defendants assert that the award for Mr. Smith's future medical expenses should be reduced because even if additional surgeries are recommended, according to life expectancy statistics, Mr. Smith will more probably than not be deceased by the time the additional surgeries would be needed.

Plaintiffs argue the jury heard Mr. Smith's treating physicians testify he would more likely than not, based on a reasonable degree of medical certainty, require three future orthopedic surgeries, notwithstanding life expectancy statistics. Plaintiffs

---

[13] Mr. Smith turned sixty-six during the trial in this matter, October 13, 2022.

[14] Dr. Savant attributed $254,008.75 for "Surgical/Interventional Treatment" in the life care plan for Mr. Smith, with the grand total being $395,317.60.

[15] Mr. Schellhaas was also accepted as an expert in computing lost wages and present value of the life care plan.

specifically refer to Dr. Baronne's explanation that Mr. Smith's need for surgery could be sooner in light of his past hip surgery and as "someone with a four-level fusion . . . and an abnormal gait[.]" Plaintiffs also reference testimony offered by Defendants' expert, Dr. Bertuccini, a spine neurosurgeon who performed an AME of Mr. Smith. Despite Dr. Bertuccini testifying that there is no evidence Mr. Smith's future surgeries will occur, he also acknowledged that predicting what medical care a patient will have in the future "is ludicrous, because no one can do that." Thus, Plaintiffs contend the jury's decision to award the costs of three future orthopedic surgeries was reasonable.

Plaintiffs also assert Defendants did not present any expert to refute Mr. Schellhaas' calculations concerning the cost of Mr. Smith's future medical care. Mr. Schellhaas calculated the value of the life care plan prepared by Dr. Savant to be $470,250.00, which reflects the amount the jury awarded Mr. Smith for future medical expenses.

In awarding the exact amount calculated by Mr. Schellhaas for Mr. Smith's future medical care, we find the jury clearly accepted the testimony of Plaintiffs' experts concerning his need for future medical care or rejected Defendants' contention that Mr. Smith's age determined the likelihood, or unlikelihood, that he would undergo future surgeries. After reviewing the record in its entirety, we do not find it was manifestly erroneous for the jury to conclude Plaintiffs proved an entitlement to future medical care and an entitlement to expenses for such. Thus, we find no merit to Defendants' first assignment of error.

*Assignment of Error No. 2—Future Lost Earnings/Earning Capacity*

Defendants also assign error with the jury's future lost earnings/earning capacity award, urging the award to be an abuse of discretion because the jury allegedly failed to take into consideration testimony from two of Mr. Smith's

treating physicians regarding his ability to work. The jury awarded Mr. Smith $351,554.00 for future lost earnings/earning capacity based on the amount calculated by Mr. Schellhaas. Though his calculation was based on the presumption that Mr. Smith would not be returning to any type of employment, Mr. Schellhaas acknowledged his calculation would be affected if Mr. Smith could do some type of employment.

Mr. Schellhaas testified his opinions regarding Mr. Smith's inability to work were based on the Conservant Healthcare report prepared by Plaintiffs' expert vocational rehabilitation counselor, Joyce Beckwith ("Ms. Beckwith"). Ms. Beckwith, also a certified life care planner, testified Mr. Smith was not capable of any future employment; however, she conceded that if a treating physician testified Mr. Smith could work, she would defer to that physician.

Defendants argue the evidence at trial did not establish Mr. Smith cannot return to work. They allege that two of Mr. Smith's treating physicians—specifically Drs. Baronne and Strother—testified Mr. Smith could perform sedentary work. Defendants also point to the testimonies of Dr. Bertuccini, who opined there was no physical reason Mr. Smith cannot work, as well as the testimony of their expert vocational rehabilitation counselor, Stanley McNabb. Mr. McNabb's opinion that Mr. Smith could perform sedentary jobs was based on Dr. Bertuccini's opinion.

In contrast, Plaintiffs contend the jury's lost earnings/earning capacity award was not manifestly erroneous. They point to Mr. Smith's work history, arguing the jury clearly believed he would work if he could. Further, Plaintiffs contend the jury was well within its discretion to accept the testimony of their experts over that of the defense.

Our review of the evidence revealed that Drs. Baronne and Strother both testified they would defer to the vocational rehabilitation counselor who worked

with Mr. Smith, i.e., Ms. Beckwith, as to what types of work, if any, Mr. Smith may or may not be able to do given his current condition. Ms. Beckwith testified there was no job Mr. Smith could perform due to his physical and mental limitations.

"The jury's determination of the amount, if any, of an award of damages, including lost earning capacity, is a finding of fact." *Ryan v. Zurich Amer. Ins. Co.*, 07-2312, p. 7 (La. 7/1/08), 988 So.2d 214, 219.

Although the jury was presented with conflicting evidence on this issue of Mr. Smith's future lost wages/earning capacity, there was a reasonable basis for the jury's award. This award was not manifestly erroneous. Thus, we find no merit to Defendants' second assignment of error.

### Assignment of Error No. 3—General Damages

Defendants also assign error with the jury's award of $3,175,000.00 in past and future general damages to Mr. Smith, urging such an award is excessive and should be reduced. The jury awarded Mr. Smith general damages for physical pain and suffering, mental pain and suffering, and loss of enjoyment of life.

The aim of general damages is to restore the plaintiff to the circumstances he or she was in just before the injury occurred. *Anderson v. State of Louisiana*, 18-001 (La.App. 3 Cir. 8/29/18), 258 So.3d 925. "Pain and suffering, both physical and mental, refers to the pain, discomfort, inconvenience, anguish, and emotional trauma that accompanies an injury." *McGee v. A C & S, Inc.*, 05-1036, p. 5 (La. 7/10/06), 933 So.2d 770, 775. "Loss of enjoyment of life, sometimes known as hedonic damages, refers to the detrimental alterations of a person's life or lifestyle or a person's inability to participate in the activities or pleasures of life that were formerly enjoyed." *Id.* at 773.

"In the assessment of damages in cases of offenses, . . . much discretion must be left to the judge or jury." La.Civ.Code art. 2324.1. General damages, which

21

include pain and suffering, "are inherently speculative in nature and cannot be fixed with mathematical certainty." *Wainwright v. Fontenot*, 00-492, p. 6 (La. 10/17/00), 774 So.2d 70, 74 (citation omitted).

In *Pete v. Boland Marine & Manufacturing Co., LLC*, 23-170 (La. 10/20/23), 379 So.3d 636, the Louisiana Supreme Court modified the role of the appellate court in reviewing general damages. Specifically, the supreme court explained:

> We do not abandon the two-step analysis for the appellate review of a general damage award but modify the analysis as follows. The question of whether the trier of fact abused its discretion in assessing the amount of damages remains the initial inquiry. However, to evaluate this issue, an appellate court is to include a consideration of prior awards in similar cases, as well as the particular facts and circumstances of the case under review. If an abuse of discretion is found, the court is to then also consider those prior awards to determine "the highest or lowest point which is reasonably within that discretion."

*Id*. at 644 (citation omitted). Thus, "a review of prior awards is a starting point in evaluating whether a general damage award is an abuse of discretion, since courts must also consider the specific facts and circumstances of each case." *Levine v. Nationwide Agribusiness Ins. Co.*, 23-488, 23-489, p. 13 (La.App. 3 Cir. 3/6/24), 381 So.3d 908, 920.

With the previously discussed evidence in support of Mr. Smith's general damage award, we now review general damage awards in similar cases, noting, however, that no two cases are alike. We consider the following cases, as they are the most recent and authoritative, in determining whether the award is so excessive as to constitute an abuse of discretion.

In *Sabillon v. Max Specialty Ins. Co.*, 13-513 (La.App. 4 Cir. 3/12/14), 137 So.3d 707, the fourth circuit upheld a jury's general damage award totaling $3,833,333.00. There, the plaintiff suffered a head injury resulting in a TBI with tinnitus, memory loss, headaches, dizziness, as well as cervical, lumbar and shoulder pain, with a lumbar surgery recommendation. Adjusted for inflation as of the

22

October 2022 trial date, using the U.S. Bureau of Labor Statistics Consumer Price Inflation ("CPI") Calculator,[16] this award was $4,834,587.71 at trial.

In *Franks v. State Nat'l Ins. Co.*, 22-169 (La.App. 3 Cir. 1/25/23), 355 So.3d 1174, *writ denied*, 23-259 (La. 4/18/23), 359 So.3d 512, this court upheld a jury's general damage award of $2.7 million. There, the plaintiff underwent two neck surgeries, resulting in a complete seven-level fusion of his cervical spine. The plaintiff also needed future neck surgery.

In this case, the jury heard Plaintiffs testify that the accident completely changed Mr. Smith's life. He suffered physical injuries, which required three major surgeries, and a brain injury, which affected his cognitive skills. Whereas Mr. Smith was healthy, active, and content, this accident has left him significantly inactive, frequently in pain, depressed, and anxious.

Considering the evidence before us, the general damage awards in similar cases, and the totality of the circumstances in this case, particularly Mr. Smith's physical and mental injuries, as well as the degree in which these injuries have affected his life, we cannot say the jury abused its discretion in awarding $3,175,000.0 in past and future general damages to Mr. Smith. Defendants' third assignment of error is meritless.

***Appellees' Answer to Appeal—Mrs. Smith's Loss of Consortium***

The jury awarded Mrs. Smith $475,000.00 for her loss of consortium damages. The trial court granted Defendants' Motion for New Trial and/or Remittitur, reducing the jury's loss of consortium award to Mrs. Smith to $100,000.00. The trial court reasoned:

> [B]ased on what I witnessed in Court, the loving relationship that these parties have for each other, yes, I recognized [Mrs.] Smith is going to be put out because of the limitations that are on Mr. Smith because of

---

[16] The CPI Calculator is located at https://www.bls.gov/data/inflation_calculator.htm.

the accident. $475,000 is just way out there. That is going to be reduced to $100,000.

In answer to appeal, Plaintiffs contend the trial court's reduction of the loss of consortium damages was manifestly erroneous. We agree.

Under La.Code Civ.P. art. 2083(B), the appeal court "shall consider the reasonableness of the underlying jury verdict." The compensable elements encompassed in a loss of consortium claim include "pecuniary such elements as loss of services and nonpecuniary such elements as loss of love, companionship, affection, society, sexual relations, comfort and solace." *Thibodeaux v. Gulfgate Constr., LLC*, 18-676, p. 13 (La.App. 3 Cir. 3/7/19), 270 So.3d 721, 731. "Loss of consortium is a harm to a relational interest which occurs when the other party to the relationship suffers physical harm (invasion of an interest or personality." *McGee*, 933 So.2d at 779.

In *Franks*, 355 So.3d 1174, this court upheld a $500,000.00 jury award for loss of consortium to the wife of a plaintiff whose accident caused his pre-existing condition to become unstable, requiring two separate cervical fusion surgeries. There, the jury heard evidence of the plaintiff's need for his wife to care and to attend to him on a daily basis. In this case, Mrs. Smith has also had to devote much of her time tending to her husband's needs—particularly in keeping to his calendar and attending his doctor's visits. She also described how much their pre-accident activities have been altered by the accident and Mr. Smith's resulting injuries which has necessitated three separate surgeries and hundreds of visits with numerous doctors, most of which Mrs. Smith has attended with Mr. Smith.

For these reasons, we find the trial court erred in granting Defendants' Motion for New Trial and/or Remittitur, reducing the jury's loss of consortium award to Mrs. Smith to $100,000.00.

24

***Assignment of Error No. 4—Summary Judgment***

Despite the denial of a motion for summary judgment being generally considered an interlocutory ruling which is not appealable, "[w]hen an appeal is taken from a final judgment, the appellant is entitled to seek review of all adverse interlocutory judgments prejudicial to him in addition to the review of the final judgment." *Robertson v. Doug Ashy Bldg. Materials, Inc.*, 14-141, p. 6, fn. 13 (La.App. 1 Cir. 12/23/14), 168 So.3d 556, 562. *See also* La.Code Civ.P. arts. 968 and 2083.

In *Meziere v. State Farm Mut. Auto. Ins. Co.*, 21-430, pp. 2–4 (La.App. 3 Cir. 2/9/22), 362 So.3d 555, 558–59, this court explained that:

> A motion for summary judgment should be granted only if the pleadings, depositions, answers to interrogatories, and admissions, together with any affidavits admitted for purposes of the motion for summary judgment, show there is no genuine issue of material fact and that mover is entitled to judgment as a matter of law. La. Code Civ.P. art. 966(A)(3). On a motion for summary judgment, if the issue before the court is one on which the party bringing the motion will bear the burden of proof at trial, the burden of showing that there is no genuine issue of material fact is on the party bringing the motion. La.Code Civ.P. art. 966(D)(1); *Hart v. Mabou*, 21-28 (La.App. 3 Cir. 6/23/21), 323 So.3d 939, *writ denied*, 21-1479 (La. 12/21/21), 329 So.3d 826. On appeal, in determining whether summary judgment is appropriate, appellate courts review evidence de novo under the same criteria that governs the trial court's determination of whether summary judgment is appropriate. *Id*.
>
> An insurer seeking to avoid coverage through summary judgment bears the burden of proving that some provision or exclusion applies to preclude coverage. *Halphen v. Borja*, 06-1465 (La.App. 1 Cir. 5/4/07), 961 So.2d 1201, *writ denied*, 07-1198 (La. 9/21/07), 964 So.2d 338. "The issue of whether an insurance policy, as a matter of law, provides or precludes coverage is a dispute that can be resolved properly within the framework of a motion for summary judgment." *Green v. State Farm Mut. Auto. Ins. Co.*, 07-94, p. 3 (La.App. 1 Cir. 11/2/07), 978 So.2d 912, 914, *writ denied*, 08-074 (La. 3/7/08), 977 So.2d 917. "Summary judgment declaring a lack of coverage under an insurance policy may not be rendered unless there is no reasonable interpretation of the policy, when applied to the undisputed material facts shown by the evidence supporting the motion, under which coverage could be afforded." *Reynolds v. Select Prop., Ltd.*, 93-1480 (La. 4/11/94), 634 So.2d 1180, 1183.

With these precepts in mind, we turn to the issue presented in the cross motions for summary judgment filed by Plaintiffs and Indian Harbor—whether UM coverage was rejected under the policy issued by Indian Harbor to Wastewater.

Louisiana Revised Statutes 22:1295(1)(a)(i) mandates UM coverage equal to the liability limits in all automobile liability policies, unless the insured "rejects coverage, selects lower limits, or selects economic-only coverage, in the manner provided in [La.R.S. 22:1295(1)(a)(ii)]." Louisiana Revised Statutes 22:1295(1)(a)(ii) provides, in relevant part:

> Such rejection, selection of lower limits, or selection of economic-only coverage shall be made only on a form prescribed by the commissioner of insurance. The prescribed form shall be provided by the insurer and signed by the named insured or his legal representative. . . . A properly completed and signed form creates a rebuttable presumption that the insured knowingly rejected coverage, selected a lower limit, or selected economic-only coverage. The form signed by the insured or his legal representative which initially rejects coverage, selects lower limits, or selects economic-only coverage shall remain valid for the life of the policy and shall not require the completion of a new selection form when a renewal, reinstatement, substitute, or amended policy is issued to the same named insured by the same insurer or any of its affiliated. An insured may change the original uninsured motorist selection or rejection on a policy at any time during the life of the policy by submitting a new uninsured motorist selection form to the insurer on the form prescribed by the commissioner of insurance.

Louisiana's public policy strongly favors UM coverage and a liberal construction of the UM statute. *Duncan v. U.S.A.A.*, 06-363 (La. 11/29/06), 950 So.2d 544. "The liberal construction given the UM statute requires the statutory exceptions to coverage be interpreted strictly." *Id.* at 547.

Recently, our supreme court laid out the law regarding the proper completion of the UM form in *Berkely Assurance Co. v. Willis*, 21-1554, pp. 5–6 (La. 12/9/22), 355 So.3d 591, 595–96 (footnote omitted), as follows:

> The current UM form, prescribed under [the Louisiana Department of Insurance ("LDOI")] Bulletin [No.] 08-02, mandates the insurer's name, group name, or logo is necessary for a valid waiver of

coverage. In relevant part, the form states: "If you wish to reject UMBI Coverage, select lower limits of UMBI Coverage, or select Economic-Only UMBI Coverage, you must complete the form and return it to your insurance agent or insurance company." Completion requires filling out the UM form in its entirety except where otherwise indicated on the face of the form. *See* La. C.C. art. 2047 ("words of a contract must be given their generally prevailing meaning"). Unlike the prior iteration of the UM form at issue in *Gingles* [*v. Dardenne*, 08-2995 (La. 3/13/09)], a designated box in the current version of the form expressly provides for the entry of the insurer's name. *See Gingles*, 08-2995, p. 1, 4 So.3d at 799. Thus, Bulletin 08-02 made specific changes to the UM form by mandating the inclusion of the two boxes on the lower right corner of the form. As correctly noted by the court of appeal, while the descriptive "Optional" appears in the box provided for "Information for Policy Identification Purposes Only," no such language appears in the box provided for the insurer's name. [*Berkley Assurance Co. v. Willis*, 20-354, 20-355, pp. 14–15 (La.App. 4 Cir. 9/29/21), 328 So.3d 567, 576]. What is not optional is mandatory. Berkley had the authority, opportunity, and responsibility to assure the UM form was properly completed. *Gray v. American Nat. Property & Cas. Co.*, 07-1670, pp. 14-15 (La. 2/26/08), 977 So.2d 839, 849-50; *see also Stone v. Allstate Property and Casualty Ins. Co.*, 18-0547 (La.App. 3 Cir. 3/7/19), 269 So.3d 961 (UM form valid where insured initially rejected coverage with a check mark but supplemented with initials upon request of insurer). It was not. A requirement mandated on the face of the UM form itself can never be hyper-technical nor its absence considered a minor deviation.

In accordance with the strict construction requirement applicable to coverage exclusions, Indian Harbor "bears the burden of proving any insured named in the policy rejected in writing the coverage equal to bodily injury coverage or selected lower limits." *Duncan*, 950 So.2d at 547. Under the UM coverage statute, "rejection, selection of lower limits, or selection of economic-only coverage shall be made only on a form prescribed by the commissioner of insurance." La.R.S. 22:1295(1)(a)(ii).

In support of its motion, Indian Harbor attached the affidavit of underwriter, Andrew Mack ("Mr. Mack"); the affidavit of Todd Sims ("Mr. Sims"), Wastewater's legal representative; the UM rejection form at issue herein; and a certified copy of its policy effective for the period of June 30, 2018 to June 30, 2019. Indian Harbor argues it complied with the necessary steps and has carried its burden of showing

UM coverage was rejected by Mr. Sims, who initialed the form, which was dated prior to the issuance of the policy at issue, to select Wastewater's decision to reject UM coverage. Mr. Sims also signed and printed his name at the bottom of the form. Thus, Indian Harbor contends the tasks prescribed for properly completing a UM rejection recognized in *Duncan* were met in the present case.[17]

Plaintiffs argue Indian Harbor failed to carry its burden of proving that Wastewater signed a rejection from that complied with the dictates of La.R.S. 22:1295 as set forth by the LDOI Bulletin No. 08-02. Specifically referring to the box located on the lower right-hand corner of the form at issue, Plaintiffs allege Indian Harbor did not establish that the insurer's name, the group name, or the insured's logo was contained within the UM rejection form. The UM form signed by Mr. Sims contained the logo of XL Catlin. Thus, Plaintiffs argue the UM form was not properly completed because neither Indian Harbor's name nor logo was present. Further, Plaintiffs contend Indian Harbor did not carry its burden of establishing that XL Catlin was even the insurance group at the time the policy was issued.

Addressing Plaintiffs' arguments, Indian Harbor contends there can be no reasonable question that the UM waiver form is intended to apply to its policy. Pointing to the box located on the lower right-hand corner of the UM form at issue, Indian Harbor argues, in brief (footnotes omitted):

> It cannot be disputed that the UM waiver form submitted by [Indian Harbor] includes the name and logo of XL Catlin, which, was

---

[17] Those six tasks are described in *Duncan,* 950 So.2d at 551, as follows:

(1) initialing the selection or rejection of coverage chosen; (2) if limits lower than the policy limits are chosen (available in options 2 and 4), then filling in the amount of coverage selected for each person and each accident; (3) printing the name of the named insured or legal representative; (4) signing the name of the named insured or legal representative; (5) filling in the policy number; and (6) filling in the date.

LDOI Bulletin 08-02 issued post-*Duncan* removed the need for filling in the policy number on the rejection form. *See Meziere*, 362 So.3d 355.

28

established by unrefuted affidavit testimony,[18] is the insurance group under which [Indian Harbor] operates. The UM waiver form indicates that XL Catlin is the "insurance group" that would issue the Policy and, indeed, the very same name and logo appears on the cover page of the Policy that [Indian Harbor] ultimately issued. As reflected on the Policy's Declarations page, XL Catlin is the "insurance group," and [Indian Harbor] is the "Insurance Company Providing Coverage."

Thus, Indian Harbor argues the UM rejection form which includes the insurance group's logo is sufficient. We disagree.

As expressed in *Berkley*, 355 So.3d 596 (emphasis added):

The tasks mandated by the current UM form, prescribed under Bulletin 08-02, are as follows: 1) initialing the selection or rejection of coverage chosen; 2) if limits lower than the policy limits are chosen, then filling in the amount of coverage selected for each person and each accident; 3) printing the name of the named insured or legal representative; 4) signing the name of the named insured or legal representative; **5) filling in the insurer's name, the group name, or the insurer's logo**; and 6) filling in the date. Failure to properly complete the UM form results in an invalid rejection or selection of lower limits of UM coverage. *Duncan*, 06-0363, pp. 14-15, 950 So.2d at 553. Consequently, by operation of statute, UM coverage is equal to the liability limits of the policy. *Id.*, 06-0363, p. 16, 950 So.2d at 554; La. R.S. 22:1295(1)(a)(i).

The UM rejection form herein contains a line on which appears the logo of XL Catlin, identified as "Insurance Group." Despite Indian Harbor's arguments to the contrary, we do not consider the insurance group's logo as complying with the dictates of the LDOI's Bulletin No. 08-02.

In *Faulkner v. Tyler*, 22-532 (La.App. 3 Cir. 2/1/23), 362 So.3d 921, *writ denied*, 23-510 (La. 5/31/23), 361 So.3d 449, the only task at issue concerned the box pertaining to the identity of the insurer. The business auto policies at issue in

---

[18] The affidavit of Mr. Mack attested, in relevant part:

I am a senior underwriter employed by XL Global Services and underwrite policies through XL Global Services' affiliate, [Indian Harbor]. XL Global Services and [Indian Harbor] operated under the umbrella of XL Catlin, now known as AXA XL. I have held that position since 2015, was an underwriter for [Indian Harbor] on this account at all times relevant herein[] and am personally aware of the facts . . . .

*Faulkner* were issued by Illinois National Insurance Company; however, the "two UM rejection forms contain[ed] the pre-printed name 'Chartis Insurance.'" *Id.* at 927. This court affirmed the judgment denying the insurer's motion for summary judgment, observing that the name of the insurance group was not correct on the waiver form despite the insurer offering the affidavit of an underwriter in support of its motion. This court rejected the underwriter's attestation that the insurer operated under the former name of the insurer's affiliated company, i.e., AIG, and that Illinois National Insurance Company was, in fact, an affiliated member company. This court found, "[the underwriter] has presented no evidence indicating the actual relationship of Chartis to AIG or even when and under what circumstances Chartis ceased to be known by that name and began using AIG Property, if indeed it did so." *Id.*

In this case, the affidavit of Mr. Mack, similarly, does not establish that XL Catlin was the group under which Indian Harbor was operating when the policy herein was issued. Accordingly, we find on de novo review that the UM form in connection with the policy at issue did not provide the insurer's name or logo in the designated box and, thus, failed to comply with LDOI Bulletin No. 08-02. Wastewater's rejection of UM coverage was invalid.

## DECREE

For the foregoing reasons, the trial court judgment entered in conformity with the jury's verdict on November 3, 2022, is affirmed in all respects. The trial court judgment dated March 10, 2023, granting, in part, Defendant's Motion for New Trial and/or Remittitur as to Mrs. Smith's loss of consortium claim, is reversed. Thus, the jury's verdict, awarding $475,000.00 to Mrs. Smith for loss of consortium, is hereby reinstated. All costs of this appeal are assessed to Defendants/Appellants.

**AFFIRMED, IN PART; REVERSED, IN PART.**